In re GRAND JURY NO. 76–3 (MIA) SUBPOENA DUCES TECUM.

The SECOND NATIONAL BANK OF NORTH MIAMI, Petitioner-Appellee,

v.

UNITED STATES of America, Respondent-Appellant.

No. 76–3757.

United States Court of Appeals, Fifth Circuit.

July 18, 1977.

Robert W. Rust, U. S. Atty., Lloyd G. Bates, Jr., Asst. U. S. Atty., Miami, Fla., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Gilbert E. Andrews, Chief, Appellate Sect., Myron C. Baum, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Robert E. Lindsay, Jeffrey S. Blum, Attys., Washington, D. C., for respondent-appellant.

Michael Colodny, Glenn Thomas Harris, North Miami, Fla., for petitioner-appellee.

Before TUTTLE, MORGAN and HILL, Circuit Judges.

PER CURIAM:

As part of a criminal tax investigation, the Government desired to obtain bank records concerning two natural persons and two corporations over a four-year period from the Second National Bank of North Miami. The vast majority if not all of the records were stored on microfilm tapes. The district court granted the Bank's motion to quash a subpoena for the records. We reverse.

The apparent basis for the district court's action was a belief that "if the government has subpoenaed these records . . . the government is obligated to pay for [them]." According to the district court, it was "absurd" for the Bank to "have to bear the cost of the Government's investigation" or "to in essence finance the grand jury's investigation." These remarks, which concerned the cost to the Bank of copying the records and transmitting the copies to the Government, overlook a fundamental distinction. In determining whether a subpoena is unreasonable or oppressive, a court must first determine what

it would cost to produce the documents requested for the Government's inspection or use. The cost of re production of documents—so that the holder may retain the originals and the Government have the copies—is a cost that, in all but the most exceptional of cases, is undertaken by the holder for his own convenience. Only after a court has determined that production of the original documents is a practical impossibility may it consider the convenience cost of reproduction as a necessary consequence of compliance with the subpoena.

■ Rule 17(c) of the Federal Rules of Criminal Procedure provides that "a subpoena may . . . command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." The Advisory Committee Note states that Rule 17(c) is "substantially the same as rule 45(b) of the Federal Rules of Civil Procedure". Civil Rule 45 specifies that the court may quash or modify a subpoena duces tecum "if it is unreasonable or oppressive", or "condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things." We hold that a court in exercising its power under Rule 17(c) of the Federal Rules of Criminal Procedure may, in appropriate circumstances, "modify" the subpoena to require that the costs of compliance be borne by the Government. The question is whether that authority was properly exercised in the instant case.

■ As a general rule, a witness or the recipient of a subpoena duces tecum is required to bear the costs of compliance. Since some costs can be anticipated in complying with any subpoena duces tecum, Rule 17(c)'s provision that the court may quash a subpoena "if compliance would be unreasonable or oppressive" must be read to mean that in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence.

■ Supreme Court precedent traces a similar course. In *Hurtado v. United States,* 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973), the petitioners had illegally entered the United States. To assure their presence as material witnesses at the trials of the persons accused of illegally bringing the petitioners into the country, they were required to post bond. Unable to make bail, they were incarcerated. A federal statute required that during the period before trial the petitioners be paid $1 per day in addition to having their subsistence needs provided for by the jailer. The petitioners contended that by incarcerating them the Government had "taken" their property and that the provision for $1 a day in compensation was a denial of due process. The Supreme Court disagreed:

"But the Fifth Amendment does not require that the Government pay for the performance of a public duty it is already owed. . . . It is beyond dispute that there is in fact a public obligation to provide evidence . . . and that this obligation persists no matter how financially burdensome it may be. The financial losses suffered during pretrial detention are an extension of the burdens borne by every witness who testifies. . . . '[I]t is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned, and for performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public.' "

*Hurtado v. United States,* 410 U.S. 578, 589, 93 S.Ct. 1157, 1164, 35 L.Ed.2d 508 (1973), *quoting Blair v. United States,* 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

As the Supreme Court's quotation from the *Blair* case indicates, the duty to provide evidence has long been considered to be

almost absolute, although *Blair* of course recognized the self-incrimination exception. *Hurtado*'s lesson in the instant case is that it rejects any assertion that a potential witness has some sort of "right" to be reimbursed for his expenses in testifying. The same must be true for the production of documents. This is particularly significant when we recall that the majority if not all of the records sought by the Government from the Second National Bank of North Miami are records that the Bank is required to keep by law under the Bank Secrecy Act of 1970, 12 U.S.C. §§ 1730d, 1829b, 1951–1959, and 31 U.S.C. §§ 1051–1062, 1081–1083, 1101–1105, 1121–1122. In *California Bankers Association v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), the Supreme Court upheld the Bank Secrecy Act, which requires banks to establish microfilm records at their own expense, against a due process attack. The purpose of the Bank Secrecy Act was to prevent the use of bank accounts to conceal tax fraud, gambling operations, and other activities typical of organized crime. If the banks can constitutionally be put to the expense of originating and maintaining the records, we see little reason to believe that they may not be required to make them available to the Government.

The trial court's action in the instant case was an abuse of discretion. The record clearly shows that at the hearing on the motion to quash, no evidence whatsoever was presented by the Bank to show the cost of compliance. There was therefore no basis for a finding by the trial judge that compliance would have been "unreasonable or oppressive." Furthermore, the trial court mistakenly assumed that the cost of compliance is to be measured by the cost of *reproduction* of documents, rather than the cost of production of the originals.

REVERSED and REMANDED.