SIDNEY B. AND VERA L. STERN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14176–78.    Filed August 14, 1980.

---

*Randall G. Dick,* for the petitioners.

*Alan Summers,* for the respondent.

OPINION

HALL, *Judge:* On April 29, 1980, the Bank of America N.T. & S.A. (the bank) filed a motion for protective order pursuant to Rule 147(b), Tax Court Rules of Practice and Procedure, requesting the Court to ·order respondent to compensate the bank for all reasonable costs incurred in connection with the production of additional documents in this case. A brief summary of the prior procedural motions involved in this case is necessary in order to place the bank's request in its proper perspective.

On September 26, 1978, respondent issued a statutory notice of deficiency wherein he asserted income tax deficiencies against petitioners Sidney and Vera Stern of $1,551,956 for 1971, $688,147 for 1972, and $55,647 for 1973. One of the proposed adjustments concerns a disposition of Teledyne, Inc., stock.

Petitioner Sidney Stern organized Fireside Securities Corp. in 1952. He served as the chief executive officer of that corporation and was its majority shareholder. On August 12, 1968, Fireside Securities Corp. entered into a plan and agreement of merger with Teledyne, Inc., under which petitioners were to receive shares of Teledyne stock in exchange for their shares of Fireside Securities. The merger agreement also provided that petitioners could receive additional Teledyne shares in 1972 based upon the performance of Fireside Securities during the interim period.

On October 14, 1971, petitioners entered into a sales agreement with Wobaco Trust Ltd. (Wobaco), a Bahamian corporation,[1] acting in its capacity as trustee for Trust No. CT–1109 (hereafter referred to as the Hylton trust).[2] Pursuant to the October 14 agreement, petitioner Sidney Stern transferred 126,867 common shares of Teledyne to the trust in exchange for the trust's promise to pay Stern a yearly annuity of $222,757.01.

---

[1]During the years in issue, Wobaco was a 100-percent subsidiary of World Banking Corp., Ltd. The shareholders of World Banking Corp. were the Bank of America (45-percent ownership), the Toronto-Dominion Bank (33-percent), and several leading European banks which owned the balance.

[2]Sometime prior to 1973, the trusteeship of the Hylton trust was transferred to World Banking & Trust Corp. (Cayman), Ltd., a Cayman Islands corporation which was a wholly owned subsidiary of Wobaco. In 1973, World Banking & Trust Corp. (Cayman), Ltd., was replaced as trustee by Canadian Imperial Bank of Commerce.

Similarly, petitioner Vera Stern transferred 17,136 common shares of Teledyne to the trust in exchange for a yearly, single-life annuity to her of $27,216.85. Under the agreement, both annuities were to be paid annually commencing on October 14, 1972.

The deed of settlement for the Hylton trust recites that it was established in 1971 by Peter Hylton upon the transfer of $5,000.[3] In addition to naming Wobaco as trustee, the deed of settlement also provides that the beneficiaries of the trust are Sidney Stern, his spouse, and his issue.

In an addendum to their 1971 joint Federal income tax return, the Sterns made the following statement:

On October 14, 1971 the taxpayers exchanged the following shares of stock and cash for the right of each to receive a sum annually for the full term of each of their respective lives:

| Annual sum | | |
|---|---|---|
| Sidney B. Stern | $222,757.01 | |
| Vera F. Stern | 27,216.85 | |

| Shares and corporation | | | Sale price |
|---|---|---|---|
| Sidney B. Stern | 126,867 | shares of Teledyne, Inc. | $2,569,056.70 |
| Vera F. Stern | 17,136 | shares of Teledyne, Inc. | 347,004.00 |

Computation of each annual payment was based upon the fair market value of each share of stock of the above corporation on October 14, 1971, the date of the exchange, and the aggregate fair market value of the above shares and cash on that date was equal to the value of Sidney B. Stern, age 49, receiving the annual sum of $222,751.01[4] for his lifetime and Vera F. Stern, age 49, receiving the annual sum of $27,216.85 for her lifetime, all as determined by Table A(1) of Federal Estate Tax Regulations Section 20.2031–10(e). Pursuant to the provisions of Revenue Ruling 69–74 no gain or loss was recognized on October 14, 1971 and the tax consequences of the receipt of the annual sum by each taxpayer will not commence until the date of the first payment, October 14, 1972.

In 1972 and 1973, the Sterns reported the annuity payments as part long-term capital gains and part interest.

In his statutory notice, respondent determined that:

The annuity realized from the sale of Teledyne shares has an ascertainable fair market value in the year of sale. The entire amount of gain determined under section 1001 is recognized in the year of sale December 31, 1971.

---

[3]The tax consequences of the Hylton trust are a central issue in this case. In 1971, Peter Hylton, who is unrelated to petitioners, practiced law in the Cayman Islands.

[4]This amount should be $222,757.01.

In the alternative, it is determined that as grantor of the Bahama Trust (Wobaco Trust Limited—trustee), you are taxable on the net income from it for the taxable years 1972 and 1973 because you furnished the consideration for the creation of the trusts; the named settlor was settlor in form only; the amounts distributable are deemed to be amounts distributable without the consent or approval of an adverse party under section 677(a)(1), and that the purported annuity agreement is solely a prearranged distribution of income agreement. Your taxable income for 1972 and 1973 has accordingly been increased to include the income of the trust as owner of the trust under section 671 of the Code.

Petitioners filed their petition with the Court on December 26, 1978. At that time, they were residents of Reno, Nev.

On November 19, 1979, respondent filed a motion for order for production of documents for inspection and copying or to impose sanctions against petitioners. Among the documents requested were:

All records, receipts, memoranda, or documentation of any kind not heretofore furnished to respondent which directly or indirectly affect or affected the right of Wobaco Trust, Limited, to mortgage, sell, or otherwise deal or dispose of the securities transferred by the petitioners pursuant to the agreement dated October 14, 1971.

All letters, memoranda, notes, or documentation of any kind not heretofore furnished to respondent reflecting exchanges of information between petitioners and/or their attorneys and the trustee or other authorized individual or individuals acting for or on behalf of the trust relating to the investment policies to be followed, the amount of trust income to be distributed, and any other facet of trust administration.

In his motion, respondent indicated that the above documents were particularly relevant in connection with the alternative contention involving the grantor trust provisions of the Internal Revenue Code.

On November 21, 1979, respondent served two subpoenas duces tecum on the bank. These subpoenas called for the production of various documents relating to the Hylton trust.[5] On December 5, 1979, the bank filed a response in which it indicated its inability to comply with the subpoenas on account

---

[5]Although the subpoenas were directed at Bank of America N.T. & S.A., the subpoenas have been construed as also relating to documents held by first-tier and lower-tier subsidiaries of Bank of America N.T. & S.A.

of the bank secrecy laws in effect in the Bahamas and in the Cayman Islands.[6]

On December 5, 1979, a hearing was held in San Francisco at which respondent's counsel, petitioners' counsel, and counsel for the bank were present. At the hearing, petitioners' counsel turned over to respondent documents previously requested in the November 19 motion for order for production of documents addressed to petitioners.[7] As a consequence of the document exchange between petitioners' counsel and respondent, respondent's November 19 motion was denied.

On January 7, 1980, respondent filed (1) a motion requesting the Court to reconsider its order denying respondent's motion for production of documents, and (2) a motion to enforce the subpoenas served on the bank.

On March 10, 1980, respondent filed a motion for order requiring petitioners to seek consent to disclosure of records in the hands of the Bank of America N.T. & S.A. or its Bahamian or Cayman Islands subsidiaries or to impose sanctions.

On March 21, 1980, this Court (1) ordered petitioners to give their consent to the bank and its Bahamian and Cayman Islands subsidiaries to disclose to respondent all the records described in the two subpoenas previously served on the bank on November 21, 1979, (2) granted respondent's January 7 motion for reconsideration, and (3) ordered petitioners to request from the trustees of the Hylton trust copies of the documents listed in respondent's November 19 motion for production of documents and to deliver those copies to respondent for inspection. As a result of petitioners' compliance with the Court's March 21 orders, just prior to April 23, 1980,[8] the date on which the trial in this case commenced,[9] respondent was able to obtain copies of bank documents relating to the Hylton trust.

---

[6]See n.2 *supra.*

[7]It has come to our attention that included among these documents was a letter dated June 11, 1973, from World Banking & Trust Corp. (Cayman), Ltd., to Elliot Steinberg. This two-paragraph letter bore the caption "Re: Hylton & Florcken Trust" and read, in pertinent part, as follows:

"Following on my recent telephone conversation I now enclose, for your information, photo copies of all the various deposit receipts that we, in our capacity as banker, have issued to the above mentioned two trusts in respect to their various Euro dollar deposits, placed with us, since we sold their respective Teledyne shareholdings."

[8]Respondent's ability to obtain these documents has mooted his Jan. 7 motion to enforce the two subpoenas previously served on the Bank of America.

[9]The Court originally scheduled this trial to commence on Apr. 29, 1980, in San Francisco, Calif. Due to the limited availability of a key foreign witness, the parties agreed to take the

The bank documents obtained by respondent made several references to a second trust, No. CT–1136 (hereinafter referred to as the Florcken trust). Subsequently, respondent obtained the deed of settlement of the Florcken trust and a sales agreement between petitioner Sidney Stern and World Banking & Trust Corp. (Cayman), Ltd., the trustee of the Florcken trust. The deed of settlement of the Florcken trust indicates that it was established in 1972 by Herbert G. Florcken upon the transfer of $1,000.[10] In addition to naming World Banking & Trust Corp. (Cayman), Ltd., as trustee, the deed of settlement provides that the beneficiaries of the trust are Vera Stern and her issue.

Under the sales agreement, Sidney Stern transferred 136,850 common shares of Teledyne stock to the Florcken trust in exchange for a lifetime annual annuity of $203,519.83, with the first annuity payment to begin on September 15, 1975. The Teledyne shares transferred to the trust were those contingent shares received by Sidney Stern pursuant to the merger agreement between Teledyne, Inc., and Fireside Securities Corp. Unlike the prior sale-annuity agreement executed in 1971, the 1972 agreement was not disclosed on petitioners' 1972 joint Federal tax return; nor does it appear that petitioners reported any income from the 1972 transaction on their 1972 or 1973 joint Federal income tax returns.

The Court was first notified of the existence of the Florcken trust at the April 23, 1980, partial trial held in Phoenix, Ariz. At that time, the Court indicated it would decide what to do with the Florcken trust issue when it reconvened to take further testimony on April 29 in San Francisco. When the trial reconvened in San Francisco, respondent indicated his intention to file a second amended answer to assert additional deficiencies based on the newly obtained information regarding the 1972 sale-annuity transaction. After hearing testimony on April 29, the Court continued this case pending further direction by the Court.

On April 24, respondent served the bank with a subpoena

---

testimony of this witness on Apr. 23, 1980, in Phoenix, Ariz. The rest of the trial was expected to be completed on the originally scheduled date, Apr. 29, in San Francisco. However, in the time available, it did not prove possible to complete the taking of testimony at that time.

[10]Herbert Florcken is petitioner Vera Stern's father.

duces tecum for documents relating to the Florcken trust. In response to respondent's subpoena, the bank filed the motion for protective order which is the subject matter of this opinion. In its motion, the bank requested "that the Court condition any order which compels, directly or indirectly, the Bank of America N.T. & S.A. to produce further documents in connection with this litigation pursuant to motion of respondent herein, upon the payment by respondent of the reasonable costs of compliance with such Court order."

In support of its motion, the bank made the following assertions:

1. As of the date of trial in this matter, April 23, 1980, respondent had served six (6) subpoenas *duces tecum* on various officers of the Bank in connection with this litigation.[11]

2. The Bank has fully complied, either directly or indirectly, with all of those six subpoenas.

3. On April 24, 1980, the Bank was served with still another subpoena *duces tecum* by respondent, requesting all documents and materials in its possession pertaining to a trust, the operation of which is not even an issue presently before this Court.

4. The Bank has incurred considerable expenses in connection with the first six (6) subpoenas, particularly those subpoenas served on the Bank on November 21, 1979 which required production of documents protected under foreign secrecy laws. In that regard, the Bank and its related subsidiaries were required to consult frequently with local counsel in the countries in which these documents were located to avoid violation of pertinent secrecy laws. Additionally, the Bank and its related subsidiaries incurred considerable expenses in telephone and telegraphic communications necessary to coordinate the compilation and release of documents, not to mention the considerable cost of employees' time in reviewing the documents to ensure that they fell within the scope of the request and the actual reproduction time. Moreover, respondent has now requested the Bank to certify that materials submitted to respondent by petitioner consist of all the materials made available to petitioner from the

---

[11]The bank attached the following list of subpoenas to its motion:

| | | |
|---|---|---|
| 1. | Nov. 21, 1979 | Documents relating to Hylton trust. |
| 2. | Nov. 21, 1979 | Documents relating to Hylton trust. |
| 3. | Apr. 8, 1980 | Documents relating to trust account maintained at Bank of America, N.Y. |
| 4. | Apr. 8, 1980 | Documents relating to the transfer of shares of Teledyne, Inc., owned by the petitioners. |
| 5. | Apr. 17, 1980 | Documents relating to employment of Peter Hylton. |
| 6. | Apr. 22, 1980 | Documents relating to transfer of Teledyne shares owned by petitioners. |
| 7. | Apr. 24, 1980 | Documents relating to Florcken trust. |

trust company files, a task which will involve considerable additional time and expense for the Bank and its related subsidiaries.

5. The documents now requested by respondent's most recent subpoena (#7) served upon the Bank would be found, if any exist, in the possession of the same foreign entities who had possession of the Hylton Trust documents, and would be subject to the same prohibitions against disclosure under foreign secrecy laws as were articulated in the Bank's *Memorandum of Law in Opposition to Respondent's Subpoenas Duces Tecum* filed with the Court on February 29, 1980.

6. Should the Court order the production, either directly or indirectly, of documents encompassed, in whole or in part, by the subpoena referred to in paragraph 5 above, located at the Bank's overseas trust company subsidiaries, these trust companies will again be required to incur substantial search and duplication costs and will again be required to obtain opinions of local counsel as to the permissibility and appropriate scope of disclosure of requested information. Had these documents been subpoenaed concurrently with those relating to the Hylton Trust, the Bank could have avoided burdensome duplication of costs and time involved in producing these additional materials and the attendant costs of foreign counsel opinions would have been minimized.

\* \* \* \* \* \* \*

8. Before the Bank, or its subsidiaries, are compelled to take any further action to provide documents and related materials to respondent pursuant to subpoena or order of the Court, it is requested that the Court issue an order directing respondent to compensate the Bank for any and all reasonable costs related to producing the requested material including, but not limited to, the cost of obtaining necessary foreign counsel opinions concerning the permissibility and appropriate manner of releasing information protected by foreign secrecy law.

On June 9, 1980, respondent filed a motion for order for production of documents for inspection and copying or to impose sanctions. In this motion, respondent requested that petitioners be required to request from the trustee of the Florcken trust copies of all records, documents, or other materials of any kind whatsoever not previously furnished to respondent which relate to the trust's management and operation between January 1, 1971, and December 31, 1973. On July 28, 1980, the Court ordered petitioners to give their consents to the bank and its Bahamian and Cayman Islands subsidiaries to disclose to respondent the above materials. Furthermore, the Court ordered petitioners to request copies of the materials from the trustee of the Florcken trust for respondent's inspection.

On July 21, 1980, respondent filed a motion for leave to file a second amended answer. The Court granted this motion on July 25, 1980. In his second amended answer, respondent asserted

additional income tax deficiencies for 1972 and 1973 relating to the sale-annuity transaction involving the Florcken trust. Respondent applied the same alternative theories to the Florcken trust that he previously applied to determine the tax consequences of the Hylton trust. In addition, respondent asserted a gift tax deficiency against petitioner Sidney Stern for the quarter ended September 30, 1972.

The issue presented by the bank's motion for protective order is whether the Court should condition the further production of documents by the bank on the payment of reasonable costs by respondent.[12] The Bank claims that the production of documents related to the Florcken trust will entail a substantial duplication of the costs previously incurred in producing the documents related to the Hylton trust. According to the bank, the blame for this duplication of costs and effort lies with respondent because he did not subpoena the Florcken trust documents concurrently with the Hylton trust documents.

Rule 147(b), Tax Court Rules of Practice and Procedure, provides: [13]

*Production of Documentary Evidence:* A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the Court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive, or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

---

[12]It appears from the bank's motion that among the costs requested are: telephone and telex expenses; the cost of employee search time; legal fees; and duplication costs.

[13]Although the Bank of America's motion for protective order requests relief under Rule 147(b) Tax Court Rules of Practice and Procedure, such relief could have been requested under Rule 103(a)(9). That Rule provides:

PROTECTIVE ORDERS

(a) *Authorized Orders:* Upon motion by a party or any other affected person, and for good cause shown, the Court may make any order which justice requires to protect a party or other person from annoyance, embarrassment, oppression, or undue burden or expense, including but not limited to one or more of the following:

\* \* \* \* \* \* \*

(9) That expense involved in a method or procedure be borne in a particular manner or by specified person or persons.

Regardless of the Rule under which the bank proceeds, we adhere to the views expressed in this opinion.

Rule 147(b) is substantially the same as Rule 45(b), Federal Rules of Civil Procedure.[14] Notes to Tax Court Rules of Practice and Procedure, 60 T.C. 1137 (1973). In interpreting the scope of Rule 147(b), this Court may look for guidance from its analog in the Federal Rules of Civil Procedure.

Compliance with a subpoena duces tecum will necessarily involve some costs. Rule 147(b) does not guarantee that the party at whom a subpoena duces tecum is directed will be reimbursed for those expenses. See *Securities & Exchange Commission v. Arthur Young & Co.*, 584 F.2d 1018, 1033, (D.C. Cir. 1978), cert. denied 439 U.S. 1071 (1979). In fact, the language of the Rule indicates that the advancement of costs is a means of ameliorating an otherwise oppressive or unreasonable subpoena. See *United States v. Friedman*, 532 F.2d 928, 937 (3d Cir. 1976); *Securities & Exchange Commission v. OKC Corp.*, 474 F. Supp. 1031, 1037 (N.D. Tex. 1979); 5a J. Moore, Federal Practice, Par. 45.05 [2], n. 45. Absent an oppressive or unreasonable subpoena, the Court will not invoke its powers under the Rule. This construction of Rule 147(b) comports with the general notion that each individual has a general duty to respond to governmental process and to give testimony when properly summoned. *Securities & Exchange Commission v. Arthur Young & Co.*, *supra* at 1033; *United States v. LaPorte City State Bank*, an unreported opinion (N.D. Iowa 1976, 38 AFTR 2d 76–6201, 76–2 USTC par. 9758); *United States v. International Business Machines Corp.*, 62 F.R.D. 507 (S.D. N.Y. 1974). As succinctly stated elsewhere:

in consequence, subpoenaed parties can legitimately be required to absorb reasonable expenses of compliance * * * . It follows that the power to exact reimbursement as the price of enforcement is soundly exercised only when the financial burden of compliance exceeds that which the party ought reasonably be made to shoulder. And what is reasonable will depend—as over the legal spectrum it ultimately does—upon the circumstances of each case. [*Securities*

---

[14]Rule 45(b), Fed. R. Civ. P., reads as follows:

(b) For Production of Documentary Evidence. A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

& Exchange Commission v. Arthur Young & Co., supra at 1033. Fn. refs. omitted.]

A facts and circumstances approach recognizes that not all recipients of a subpoena duces tecum are similarly situated. Among the factors that may effect the Court's determination of whether the advancement of costs is warranted are: (1) The nature of the recipient's business, see *United States v. Friedman, supra*, at 937; *Blank v. Talley Industries, Inc.*, 54 F.R.D. 627 (S.D. N.Y. 1972);[15] (2) the size of the recipient's business, see *United States v. Covington Trust & Banking Co.*, 431 F. Supp. 352, 356 (E.D. Ky. 1977); *United States v. International Business Machines Corp., supra* at 510;[16] (3) the estimated cost of compliance, see *Securities & Exchange Commission v. Arthur Young & Co., supra* at 1033, 1034; *Celanese Corp. v. E.I. duPont de Nemours & Co.*, 58 F.R.D. 606, 609 (D. Del. 1973); and (4) the extent to which the recipient must compile information from his records or documents, see *United States v. American Optical Co.*, 39 F.R.D. 580, 587 (N.D. Cal. 1966); *Ulrich v. Ethyl Gasoline Corp.*, 2 F.R.D. 357, 359 (W.D. Ky. 1942).

The flexibility inherent in the facts and circumstances approach permits us to recognize that, under certain circumstances, the actions of the person in whose behalf the subpoena

---

[15]Particularly relevant is the following excerpt from *United States v. Friedman:*

"A manufacturer, who may only have dealt with a taxpayer quite casually and occasionally, for example, might not be required, as a part of the cost of doing business, to make and unreimbursed record search. A bank, however, whose business is the facilitation of financial transactions, and which keeps records of all customer dealings as a matter of course, if not law, may be required to do so. [532 F.2d at 937; fn. ref. omitted.]"

[16]As stated in *United States v. International Business Machines Corp.*, 62 F.R.D. 507, 509–510:

"The only distinction between these movants and the prior applications for costs by nonparty deponents is that these movants are larger and the subpoenas served on them are more comprehensive. Consequently, the costs for complying are necessarily greater. But this distinction is hardly a basis for treating the movants currently before the court differently from the previous applicants. In this regard, the observation made by Judge Weinfeld almost twenty-two years ago should be noted:

" 'Inconvenience is relative to size. Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than [a major corporation] with * * * thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure * * * the enforcement of our laws.'

"Application of Radio Corporation of America, 13 F.R.D. 167, 172 (S.D.N.Y. 1952). Although the costs of complying with the subpoena are larger for the movants currently before the court, these movants have greater resources to bear these costs."

is issued may warrant the advancement of reasonable costs under Rule 147(b). For instance, if, in this case, respondent were to blame for an otherwise avoidable duplication of costs and effort by the bank in supplying the Florcken trust materials, then the result would be different. After careful review of the entire record, we find that the facts do not support the conclusion that respondent is to blame for the late date of the Florcken trust subpoena. Respondent discovered the circumstances surrounding the Florcken trust only *after* he had, through strenuous efforts, finally been able to obtain the documents relating to the Hylton trust.[17] Whereas the sale-annuity transaction between petitioners and the Hylton trust was disclosed on petitioners' 1971 joint Federal tax return, a similar transaction occurring the following year involving the Florcken trust was concealed. Although we do not know why the latter transaction was not disclosed, it is likely that if it had been disclosed the documents of both trusts would have been subpoenaed concurrently.

We conclude that the above circumstances do not warrant the granting of the bank's motion for protective order.

*An appropriate order will be issued.*

---

[17]As far as we are aware, the only information regarding the Florcken trust in respondent's possession prior to obtaining the Hylton trust documents was the June 11, 1973, letter which petitioner's counsel turned over to respondent at the Dec. 5 hearing. See n.7 *supra*. The fleeting reference to the Florcken trust contained in that letter, however, is not sufficient to blame respondent for the late date of the Florcken subpoena. The June 11 letter disclosed none of the details of the Florcken trust, for example, the circumstances surrounding the creation of the trust, the beneficiaries of the trust, the purpose of the trust, or petitioners' relationship to the trust. Without such information, it is difficult to imagine how respondent could have been expected to have determined whether the Florcken trust would have been of any potential tax consequence to petitioners for the years in issue.