JOANNA M. GRANDBOUCHE, PETITIONER *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 26785–90.        Filed November 30, 1992.

*Larry M. Lopez,* for petitioner.
*Frederick J. Lockhart, Jr.,* for respondent.

OPINION

JACOBS, *Judge:* Respondent determined a deficiency in petitioner's 1987 Federal income tax as follows:

*Additions to tax*

| Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6654 | Sec. 6661 |
|---|---|---|---|---|
| $238,606 | $11,930 | [1] | $12,881 | $59,652 |

[1] 50 percent of the interest due on the entire deficiency.

All section references are to the Internal Revenue Code in effect for 1987, and unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

The matters presently before the Court are a motion under Rule 103(a)(7) for a protective order filed by the National Commodity and Barter Association/National Commodity Exchange (NCBA/NCE; NCBA and NCE); a supplemental motion under Rule 103(a)(7) for a protective order filed by NCBA/NCE; and a motion under Rules 103(a)(9) and 147(b) filed by Affiliated National Bank-Littleton (the bank) for an award of costs and expenses relating to a subpoena duces tecum.

*Background*

The facts recited herein are derived from moving papers and affidavits provided by the parties and NCBA/NCE. Recital of those facts for purposes of this opinion implies no conclusion on our part that they will ultimately be established at trial or otherwise.

Petitioner was a resident of San Jose, California, at the time she filed her petition. She is the widow of John Grandbouche (Grandbouche). Grandbouche was the founder of NCBA and NCE (a "service wing" of NCBA), and various other groups involved in the tax protester movement. Grandbouche died in 1986.

Grandbouche, NCBA, NCE, and individuals associated with them have been under investigation by respondent over a number of years because of their suspected tax protester activities.[1]

NCBA has been described as an "unincorporated, voluntary, political association of individuals whose members promote individual civil liberties, and extensive tax and monetary reforms". *Holderbaum v. United States,* 589 F. Supp. 107, 108 (D. Colo. 1984). NCBA, in its own words, "espouses dissident views on the federal tax system and advocates a return to currency backed by gold and/or silver". *Voss v. Bergsgaard,* 774 F.2d 402, 405 (10th Cir. 1985). More specifically, it has been found that:

> NCBA is an association dedicated to limited government, privacy in personal and financial affairs, and the protection of private property. NCBA advocates * * * the abolition of the Internal Revenue Service, and a return to the gold standard. It disputes the constitutionality of the Federal Reserve System and many of the federal administrative agencies. * * *
>
> NCBA also provides its members with various financial services. For example, members can participate in a plan under which NCBA pays legal expenses for IRS audits and criminal tax prosecutions. * * * NCBA operates, through its wing NCE, a service through which members can purchase precious metals and pay bills with a minimum of recordkeeping. * * *
>
> [*In re Grand Jury Proceeding,* 842 F.2d 1229, 1230 (11th Cir. 1988).]

In addition, NCE has been described as a "warehouse bank" which operates as follows:

> members send their federal reserve notes to the NCE, which converts the notes into silver and gold. Thereafter, when directed by a payout authorization signed by a customer, the NCE reconverts the silver and gold into federal reserve notes and makes payment directly to the cus-

---

[1] *Pleasant v. Lovell,* 974 F.2d 1222 (10th Cir. 1992); *National Commodity & Barter Association v. United States,* 951 F.2d 1172 (10th Cir. 1991); *National Commodity & Barter Association v. Gibbs,* 886 F.2d 1240 (10th Cir. 1989); *Pleasant v. Lovell,* 876 F.2d 787 (10th Cir. 1989); *In re Grand Jury Proceeding,* 842 F.2d 1229 (11th Cir. 1988); *Grandbouche v. Clancy,* 825 F.2d 1463 (10th Cir. 1987); *Voss v. Bergsgaard,* 774 F.2d 402 (10th Cir. 1985); *In re First Nat. Bank, Englewood, Colo.,* 701 F.2d 115 (10th Cir. 1983); *Heinold Hog Market, Inc. v. McCoy,* 700 F.2d 611 (10th Cir. 1983); *Holderbaum v. United States,* 589 F. Supp. 107 (D. Colo. 1984).

tomer's designated creditors. NCE literature claims that the NCE protects customer privacy "by providing a bill-paying service through which you can pay your creditors without generating a paper trail in the Federal Reserve System which is traceable back to you." That same literature declares that "should [NCE] receive an order from a court of competant [sic] authority directing that records of an account-holder be turned over to the I.R.S., etc., the legal resources of [NCBA] will fight the order." [*Heinold Hog Market, Inc. v. McCoy,* 700 F.2d 611, 612-613 (10th Cir. 1983); citations omitted.]

Further, NCE has been found to be an organization designed to operate in secrecy, leave no paper trail, and avoid service of process by means of the following:

[NCE] [provides] a bill paying service that leaves no paper trail through the Federal Reserve System (even NCE's cancelled checks representing payment of bills for its account holders are destroyed after 90 days). To avoid taxation and scrutiny from any source, Grandbouche designed an "unincorporated association" apparently with no formal governing structure, oral irrevocable delegations, and no paper records (except the "Common Law" contract, the ledger showing gold and silver balances, and checks that cleared within the last 90 days). * * * [*Id.* at 616.]

On audit respondent determined that petitioner had unreported income for 1987 from certain NCBA currency transactions. Such deficiency determination was based on certain currency transaction reports (Form 4789) which the bank completed and submitted to respondent. These reports reflected currency transactions involving NCBA and NCE which referenced petitioner's Social Security number. Petitioner timely filed a petition with this Court for review of respondent's determinations.

Thereafter, on October 9, 1991, respondent served a subpoena duces tecum on Cindy S. Hathaway (Ms. Hathaway) in her capacity as a vice president of the bank (the first subpoena). The first subpoena commanded Ms. Hathaway to appear before the Court on November 4, 1991, and to bring with her:

The following records and any other written documents in your possession and control and/or to which you have access and a right to possession and control of or relating to all banking transactions between December 1, 1986, and February 1, 1988, in the name of Joanna M. Grandbouche or using or referencing the Social Security number of Joanna M. Grandbouche, * * *, including specifically, but without limitation, the following:

1. All Internal Revenue Service Forms 1099 issued to Joanna M. Grandbouche or under * * * [her] taxpayer identification number.

2. All signature cards, bank statements, checks, microfilm of checks, deposit slips, and microfilm, or other record, of deposit items for each bank account in the name of Joanna M. Grandbouche.

3. All signature cards, bank statements, checks, microfilm of checks, deposit slips, and microfilm, or other record, of deposit items for each bank account in the name of the National Commodity and Barter Association and/or the National Commodity Exchange, including, specifically, but without limitation for account number 014 756 3.

4. All Form 4789 Currency Transaction Reports completed in the name of the National Commodity and Barter Association and/or the National Commodity Exchange.

5. All Form 4789 Currency Transaction Reports completed in the name of Joanna M. Grandbouche and/or using [her] Taxpayer Identification Number/Social Security Number * * *.

6. All microfilm or other copies of the checks cashed for currency and referenced in the currency transaction reports described in paragraphs numbered 4. and 5. above.

7. All correspondence and memoranda of conversations with Joanna M. Grandbouche and with the National Commodity and Barter Association and/or the National Commodity Exchange, or their representatives, concerning the subject currency transaction reports.

On October 28, 1991, NCBA mailed to respondent a document captioned for this case entitled "Motion with Points and Authorities to Modify Tax Court Subpoena for Records". NCBA did not file this document with the Court. Also on October 28, 1991, NCBA's attorney telephoned respondent's attorney to request that respondent agree to modify the first subpoena. Respondent rejected such request.

By order dated October 29, 1991, on motion by petitioner, this case was stricken from the calendar for the November 4, 1991, Denver, Colorado, trial session and continued indefinitely. As a result, the first subpoena was not returnable on the November 4, 1991, calendar call date.

On February 4, 1992, respondent served another subpoena duces tecum on Ms. Hathaway (the second subpoena). The second subpoena commanded Ms. Hathaway to appear before the Court on May 11, 1992, and to bring with her the same documents previously identified in the first subpoena.

On March 26, 1992, petitioner served a subpoena duces tecum on Frank Taylor (Mr. Taylor), president of the bank (the third subpoena). The third subpoena commanded Mr. Taylor to appear before the Court on April 16, 1992, and to bring with him those bank records relating to petitioner. The

third subpoena identified only those records reflecting petitioner's name or taxpayer identification number and documents pertaining to the bank's policy and instructions in preparing and filing currency transaction reports.

NCBA filed a motion for a protective order with supporting affidavit on April 3, 1992. In its motion, NCBA alleges that some of the bank records requested in the second subpoena contain names and other information identifying members of NCBA and NCE. NCBA asks the Court to order the bank to redact all information identifying NCBA members other than petitioner from the documents requested in the second subpoena before such documents are delivered to respondent. In its motion, NCBA argues that the disclosure of the names and other information of NCBA members "would violate the NCBA members' rights to anonymity and associational privacy."

On May 4, 1992, NCBA filed a supplemental motion for a protective order with supporting affidavits. Attached to NCBA's supplemental motion were three redacted, supporting affidavits from members of NCBA in which the affiants swore, in effect, that allowing respondent to have access to NCBA's bank records would have a chilling effect on their membership in NCBA. Respondent filed an objection to these on April 13, 1992.

On May 6, 1992, petitioner filed a response to respondent's objection to NCBA's motions for a protective order. In her response, petitioner alleges that the second subpoena is overbroad because it enables respondent to abuse the subpoena power by obtaining unwarranted information about NCBA/NCE. Petitioner, thus, asks the Court to quash respondent's second subpoena or limit its scope[2] to include only those documents which contain: Evidence of payments to known creditors of petitioner; petitioner's name; or petitioner's Social Security number (the limited subpoena).

A hearing on NCBA's motions for a protective order was held in Denver, Colorado, on May 11, 1992 (the hearing). As commanded by the second subpoena, Ms. Hathaway appeared at the hearing on behalf of the bank with copies of the documents identified in the second subpoena. These docu-

---

[2] Petitioner argues that it is appropriate to limit production of the bank records because of the First Amendment implications involved in the case.

ments were not relinquished to either party, pending resolution of NCBA's motions for a protective order.

At the hearing, petitioner withdrew her request for the records specified in the third subpoena. Also at the hearing, the bank requested reimbursement for costs incurred with regard to the production of documents identified in the second subpoena. The bank indicated that if it were required to screen the documents as directed by the limited subpoena, it should be reimbursed for any additional costs expended for that purpose.

On June 26, 1992, the bank filed a motion for award of costs. The bank seeks reimbursement of the $5,475.60 it incurred to produce the 20,153 documents required by the second subpoena, as well as reimbursement for those expenses it will incur if it is required to screen these documents prior to their release to respondent, as commanded by the limited subpoena.

In the bank's June 26, 1992, motion for award of costs, the bank alleges that if it is required to expedite production of the documents specified in the limited subpoena, it will have to hire additional help to screen the 20,153 documents, at a cost of $1,200. However, if the Court were to allow the bank 90 days to comply with the limited subpoena, the bank could use current staff to screen the required documents and the cost of doing such would be $680. Respondent objects to the granting of the bank's motion.

Petitioner objects to paying all or any part of the bank's expenses in complying with the limited subpoena. Petitioner posits that since she no longer desires the records specified in the third subpoena, she is not the "person in whose behalf the subpoena is issued" under Rule 147(b).

## Discussion

### A. NCBA's Motions for a Protective Order

NCBA, as an "other affected person", has filed a motion and supplemental motion for a protective order under Rule 103(a)(7). In pertinent part, Rule 103 provides:

### RULE 103. PROTECTIVE ORDERS

(a) *Authorized Orders:* Upon motion by a party or any other affected person, and for good cause shown, the Court may make any order which jus-

tice requires to protect a party or other person from annoyance, embarrassment, oppression, or undue burden or expense, including but not limited to one or more of the following:

\* \* \* \* \* \* \*

(7) That a trade secret or other information not be disclosed or be disclosed only in a designated way.

In its motions for a protective order, NCBA requests that the Court order the bank to redact all information which identifies NCBA members, other than petitioner, from all documents commanded to be produced under the second subpoena. NCBA maintains that enforcement of the second subpoena without limitation would significantly impinge on its members' First Amendment rights of freedom of association and privacy. Further, NCBA argues that disclosure of the names of NCBA members and other information relating to NCBA members would have a chilling effect on its membership.

NCBA, however, has no objection to the release of the bank records to respondent if the documents released are limited to: Documents evidencing payments to known creditors of petitioner; documents which reference petitioner's name; and documents which reference petitioner's Social Security number. Likewise, petitioner does not object to the release of the bank records if they are so limited.

Respondent argues that the manner in which NCBA operates makes it necessary for respondent to have access to all the bank records requested in the second subpoena in order to fully investigate petitioner's activities. We disagree.

It is well established that an organization or association has standing to represent the interests of its members and contributors. *Buckley v. Valeo,* 424 U.S. 1, 11-12 & n.10 (1976) (per curiam); *NAACP v. Alabama,* 357 U.S. 449, 458-459 (1958). More specifically, the Supreme Court has stated that an organization has standing to protect its members from unwarranted governmental invasion of their First Amendment right of association even though the governmental action is directed at third parties. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 497-498 (1975). In this regard, we find that NCBA has standing to raise the constitutional claims here advanced.

In determining whether a claim of infringement of First Amendment rights can be used to limit the Internal Revenue Service's (IRS) subpoena power, the Eighth Circuit has employed a two-part test. First, the party seeking to prevent disclosure of the subpoenaed material must establish "a prima facie showing of arguable First Amendment infringement". And second, once a prima facie showing has been made, "the burden then [shifts] to the government to make the appropriate showing of need for the material." *United States v. Citizens State Bank,* 612 F.2d 1091, 1094 (8th Cir. 1980).[3]

This two-part test is an adaptation of the analysis utilized by the Supreme Court in *NAACP v. Alabama,* 357 U.S. 449 (1958). In *NAACP v. Alabama, supra,* after petitioner NAACP established that its First Amendment rights were infringed by Alabama's attempt to compel disclosure of its membership list, the Supreme Court required Alabama to demonstrate a compelling State interest to justify such infringement. *Id.* Alabama failed to show sufficient justification for such infringement. *Id.* at 466. While *Citizens State Bank* involved an IRS summons whereas the instant case involves a Tax Court subpoena sought by the IRS, there is no discernible reason why the *Citizens State Bank* test should not be applicable to the case at bar because in each situation the IRS sought to compel a bank to produce its records of an alleged tax protester organization. And we so hold.

In *NAACP v. Alabama, supra,* the Supreme Court recognized that the "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." 357 U.S. at 462. The Court went on to state: "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment which embraces freedom of speech." *Id.* at 460.

---

[3] The two-part test enunciated in *Citizens State Bank* has been recognized by other Circuit Courts as well. *United States v. Grayson County State Bank,* 656 F.2d 1070, 1074 (5th Cir. Sept. 1981 Unit A); *United States v. Trader's State Bank,* 695 F.2d 1132, 1133 (9th Cir. 1983); *In re First Natl. Bank, Englewood Colo.,* 701 F.2d 115, 118-119 (10th Cir. 1983) (John Grandbouche was a named petitioner-appellant).

In order to make a prima facie showing of arguable First Amendment infringement, the party seeking to prevent disclosure of certain materials must demonstrate that enforcement of a subpoena will result in:

(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or "chilling" of, the members' associational rights. * * * [*Brock v. Local 375, Plumbers Intl. Union of America,* 860 F.2d 346, 350 (9th Cir. 1988); citations and fn. ref. omitted.]

Through the affidavits of three of its members, NCBA has made an uncontroverted showing that the revelation of the identity of its members will have a chilling effect on NCBA's membership. Thus, NCBA has made a prima facie showing of arguable First Amendment infringement. Because NCBA has made a prima facie showing of arguable First Amendment infringement, the burden shifts to respondent to make the appropriate showing of need for the material under the second prong of the *Citizens State Bank* test.

In order for the Government to establish a need for material which identifies the members of a group in violation of their First Amendment rights, the Government must show that the information sought is rationally related to a compelling Government interest. *Buckley v. Valeo, supra* at 64 (citing *Pollard v. Roberts,* 283 F. Supp. 248, 256-257 (E.D. Ark.) (three-judge panel including then-Circuit Judge Blackmun), affd. per curiam 393 U.S. 14 (1968)). More specifically, the Government must show not only that there is a rational connection between the disclosure it seeks and a legitimate governmental end, but also that the governmental interest in the disclosure is cogent and compelling. *United States v. Citizens State Bank, supra* at 1094 (quoting *Pollard v. Roberts, supra*). Even if the Government can establish that there is a rational connection between the disclosure it seeks and a legitimate and substantial governmental purpose, that purpose cannot be pursued "by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488 (1960).

The instant case involves petitioner's 1987 income tax liability. Many of the bank records identified in the second subpoena relating to NCBA/NCE have no bearing on the issues involved herein. Under the facts and circumstances of this

case, we conclude that respondent has made no showing that the identities of NCBA members, with the exception of petitioner herself, are rationally connected to respondent's investigation of petitioner's 1987 tax liability or that the disclosure of that information is sufficiently cogent and compelling to outweigh the legitimate and constitutionally protected interests of NCBA's members in having that information remain private.

At the hearing on May 11, 1992, respondent conceded that "there is some logic to limiting the subpoena to the known creditors of Ms. Grandbouche and * * * any documents that would reference her name or her [Social Security] number." In addition, as a result of responses to certain discovery requests, respondent now has available sufficient information to narrow the scope of the second subpoena. Respondent's continued press for unlimited compliance with the second subpoena is unwarranted. Therefore, we shall grant NCBA's motion for a protective order by limiting production of the documents identified in the subpoena duces tecum served February 4, 1992, on Ms. Hathaway to those documents which contain: Evidence of payments to known creditors of petitioner; petitioner's name; or petitioner's Social Security number. Such a narrowly drawn subpoena will adequately protect the First Amendment rights of NCBA and at the same time give respondent access to documents relevant to an investigation of petitioner's 1987 tax liability.

## B. *The Bank's Motion for a Protective Order*

The bank has filed a motion for a protective order under Rules 103(a)(9) and 147(b) seeking reimbursement of its costs in producing the subpoenaed documents.

The pertinent provisions of Rule 103 are:

### RULE 103. PROTECTIVE ORDERS

(a) *Authorized Orders:* Upon motion by a party or any other affected person, and for good cause shown, the Court may make any order which justice requires to protect a party or other person from annoyance, embarrassment, oppression, or undue burden or expense, including but not limited to one or more of the following:

* * * * * * *

(9) That expense involved in a method or procedure be borne in a particular manner or by specified person or persons.

Rule 147(b), in pertinent part, states:

### RULE 147. SUBPOENAS

\* \* \* \* \* \* \*

(b) *Production of Documentary Evidence:* A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the Court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive, or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

Rules 103(a)(9) and 147(b) were fashioned after then rules 45(b) and 26(c) of the Federal Rules of Civil Procedure.[4] Explanatory Notes to Tax Court Rules of Practice and Procedure, 60 T.C. 1057, 1122-1123, 1137. Therefore, in interpreting the scope of Rules 103(a)(9) and 147(b), we look to their analogs in the Federal Rules of Civil Procedure for guidance. *Willie Nelson Music Co. v. Commissioner,* 85 T.C. 914, 917 (1985); *Stern v. Commissioner,* 74 T.C. 1075, 1084 (1980); see also Rule 1(a).

The bank argues that respondent should be required to reimburse the bank for its costs associated with the production of the subpoenaed documents. In support of its argument, the bank alleges that respondent failed to narrow the scope of document production under the first and second subpoenas even after NCBA's repeated warnings that the subpoenas were overbroad. The bank suggests that respondent's failure to issue an IRS summons to the bank for these documents during the examination stage indicates that the Government's true target was the NCBA/NCE, not petitioner. The bank, in essence, argues that respondent issued the subpoenas in bad faith. The bank, however, presents no evidence to support its argument of bad faith on the part of respondent.

Respondent contends that the bank should not prevail because it did not make a timely motion to modify or quash the second subpoena or seek a protective order "before the time specified in the subpoena for compliance therewith". Rule 147(b). Respondent misreads the Rule.

---

[4] The applicable substance of Fed. R. Civ. P. 45(b) is now located in Fed. R. Civ. P. 45(c).

Rule 147(b) provides that the recipient of a subpoena may make a motion to modify or quash the subpoena, or a motion to condition compliance on the advancement of the reasonable cost of producing the requested documents, "promptly and in any event *at or before* the time specified" to comply. Rule 147(b) (emphasis added). Therefore, contrary to respondent's interpretation of Rule 147(b), a motion under Rule 147(b) may be timely if made at the time specified in the subpoena for compliance.

In the instant case, the bank raised the issue of reimbursement of costs at the May 11, 1992, hearing, the time specified to comply with the second subpoena. Therefore, the bank's motion was timely. Having determined that the bank's motion for a protective order seeking reimbursement of its costs was timely, we now address whether and to what extent the motion should be granted.

This Court has the power to "make any order which justice requires to protect a party or other person from * * * undue burden or expense", including requiring that "expense involved in a method or procedure be borne in a particular manner or by specified person or persons". Rule 103(a), (a)(9); *United States v. Columbia Broadcasting System, Inc.,* 666 F.2d 364, 368-369 (9th Cir. 1982) (holding that the facts and circumstances of the case authorized the District Court to award post-compliance reimbursement); *United States v. Friedman,* 532 F.2d 928, 937 (3d Cir. 1976) (finding that "Using Rule 45(b) as a convenient analogy, the court can * * * condition a denial of enforcement in a §7604(b) proceeding on the reimbursement by the Government of the reasonable cost of producing the books, papers or records requested").

When a discovery subpoena is issued to a person and that person objects to the disclosure of information called for, that person can move for either a protective order pursuant to rule 26(c) of the Federal Rules of Civil Procedure, or an order quashing or modifying the subpoena, pursuant to rule 45(c) of the Federal Rules of Civil Procedure, previously rule 45(b). See Fed. R. Civ. P. 45(d); *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 559 (7th Cir. 1984). Other courts are in accord. *Centurion Industries, Inc. v. Warren Steurer & Associates,* 665 F.2d 323, 325 (10th Cir. 1981); *Heat & Control, Inc. v. Hester Industries, Inc.,* 785 F.2d 1017, 1023 (Fed.

Cir. 1986) ("Rule 45(b)(1) must be read in light of Rule 26(b)"); *Stern v. Commissioner, supra* at 1083 n.13. Moreover, our Rules are to be "construed to secure the just, speedy, and *inexpensive determination* of every case." Rule 1(b) (emphasis added). In addition, it is within the Court's discretion to condition compliance with a subpoena duces tecum on the reimbursement of costs incurred in the production of the requested documentary evidence. Rules 1, 103(a)(9), 147(b); see also Fed. R. Civ. P. 26(c), 45(c); Fed. R. Crim. P. 17(c) (which is substantially the same as prior Fed. R. Civ. P. 45(b)); *United States v. Davey,* 543 F.2d 996, 1000 (2d Cir. 1976).

The bank argues that respondent's method of discovery caused the bank to incur duplicative document production costs with regard to the subpoenas issued in this case. Respondent disagrees.[5] Instead, respondent posits that such duplication is the result of the Court's proposed narrowing of the scope of the second subpoena. Respondent further contends that, at the time the second subpoena was served on the bank, respondent did not have sufficient information to limit the request as proposed by the Court because such information became available only after petitioner responded to respondent's discovery requests. In addition, respondent contends that respondent based the determination that petitioner had omitted income for 1987 on the bank's currency transaction reports, which reflected petitioner's Social Security number. Therefore, respondent argues, under the rationale set forth in *Stern v. Commissioner,* 74 T.C. 1075 (1980), it is not unreasonable to require the bank to bear the resulting duplicate costs.

The Supreme Court has found that the Government has a right to every individual's evidence and that every individual has the duty to provide that testimony. *Hurtado v. United States,* 410 U.S. 578, 588 (1973); *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum,* 555 F.2d 1306, 1308 (5th Cir. 1977) (stating that "in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence"); *SEC v. OKC Corp.,* 474 F. Supp. 1031,

---

[5] Likewise, petitioner denies responsibility for the bank's costs. Because petitioner withdrew her request for the documents specified in the third subpoena, we conclude that petitioner is not the "person in whose behalf the subpoena is issued" under Rule 147(b); and hence, petitioner is not responsible for the bank's costs.

1037 (N.D. Tex. 1979) (finding that "Only when the financial burden of compliance exceeds that which a party ought reasonably be made to shoulder in light of the facts and circumstances of the particular case, however, should the court impose on the Government the duty of reimbursement").

The Court has discretion to decide whether costs will be allowed. *United States v. International Business Machines Corp.,* 62 F.R.D. 507, 510 (S.D.N.Y. 1974). While party witnesses must generally bear the burden of discovery costs, the rationale for this general rule is inapplicable where the discovery demands are made on nonparties. *United States v. Columbia Broadcasting System, Inc.,* 666 F.2d 364, 371 (9th Cir. 1982). Justification for this difference in treatment between parties and nonparties may be found in the following:

Nonparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party. * * * a witness's nonparty status is an important factor to be considered in determining whether to allocate discovery costs on the demanding or the producing party. [*Id.* at 371-372.]

Where the recipient of a subpoena duces tecum or summons is a bank, courts have been reluctant to condition compliance with the subpoena or summons on the reimbursement of the expenses incurred or expected to be incurred. *United States v. Continental Bank & Trust Co.,* 503 F.2d 45, 48 (10th Cir. 1974); *United States v. Mellon Bank, N.A.,* 410 F. Supp. 1065, 1069 (W.D. Pa. 1976); *United States v. Bremicker,* 365 F. Supp. 701, 703 (D. Minn. 1973). But cf. *Fox v. House,* 29 F. Supp. 673, 677 (E.D. Okla. 1939). The standard generally applied has been whether the expenses incurred in producing the records are reasonably incident to the bank's normal operations and, therefore, should be anticipated as a cost of doing business as a bank. *United States v. Friedman, supra* at 937-938; *United States v. Bremicker, supra; United States v. Jones,* 351 F. Supp. 132, 134 (M.D. Ala. 1972); *United States v. La Porte City State Bank,* 38 AFTR 2d 6201, 6202, 76-2 USTC par. 9758 (N.D. Iowa 1976). Courts must consider whether the financial burden is unreasonable and excessive in determining whether to order reimbursement of a bank's compliance costs. *United States v.*

*Southwestern Bank & Trust Co.,* 693 F.2d 994, 996 (10th Cir. 1982); *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum, supra* at 1308; *United States v. Continental Bank & Trust Co., supra* at 48; *United States v. Dauphin Deposit Trust Co.,* 385 F.2d 129, 130-131 (3d Cir. 1967). In determining whether the financial burden is unreasonable, courts have considered whether the subpoena is vague or overbroad or impossible to perform. *United States v. Continental Bank & Trust Co., supra; United States v. Covington Trust & Banking Co.,* 431 F. Supp. 352, 356 (E.D. Ky. 1977); *United States v. Mellon Bank, N.A., supra* at 1069-1070; *United States v. Jones, supra* at 133; 4 Moore, Moore's Federal Practice, par. 26.69, at 26-431 (2d ed. 1991). Expense alone does not render a subpoena unreasonable. *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum, supra; SEC v. OKC Corp., supra* at 1036.

Respondent relies on *Stern v. Commissioner,* 74 T.C. 1075 (1980). In that case, respondent subpoenaed additional bank records relating to a trust. The trust's existence only became known to respondent as a result of documents produced pursuant to earlier subpoenas duces tecum which were served on the bank. The bank then filed a motion for a protective order pursuant to Rule 147(b) asking the Court to condition the further production of bank records on the payment by respondent of all reasonable costs the bank would incur in connection with the production of the additional documents. The bank alleged that in order to comply with the latter subpoena (number seven) it would have to incur substantial duplicate costs and effort which could have been avoided had respondent asked for the additional subpoenaed records concurrently with an earlier subpoena. We therein held that the bank had not established that reimbursement of its costs was warranted under the circumstances there presented. *Id.* We reasoned that:

Compliance with a subpoena duces tecum will necessarily involve some costs. Rule 147(b) does not guarantee that the party at whom a subpoena duces tecum is directed will be reimbursed for those expenses. In fact, the language of the Rule indicates that the advancement of costs is a means of ameliorating an otherwise oppressive or unreasonable subpoena. Absent an oppressive or unreasonable subpoena, the Court will not invoke its powers under the Rule. This construction of Rule 147(b) comports with the general notion that each individual has a general duty to respond to

governmental process and to give testimony when properly summoned.
* * * [*Id.* at 1084; citations omitted.]

We went on to say that:

It follows that the power to exact reimbursement as the price of enforce-
ment is soundly exercised only when the financial burden of compliance
exceeds that which the party ought reasonably be made to shoulder. And
what is reasonable will depend—as over the legal spectrum it ultimately
does—upon the circumstances of each case. [*Id.;* citations omitted.]

Among the factors that may affect the Court's determina-
tion of whether the advancement of costs is warranted are:
(1) The nature of the recipient's business, (2) the size of the
recipient's business, (3) the estimated cost of compliance, and
(4) the extent to which the recipient must compile informa-
tion from his records or documents. *Id.* at 1085. The flexibil-
ity inherent in this facts and circumstances approach permits
us to recognize that, under certain circumstances, the actions
of the person on whose behalf the subpoena is issued may
warrant the advancement of reasonable costs under Rule
147(b). *Id.*

Based on the record in this case, the bank has failed to
show that the costs of responding to the second subpoena are
not reasonably incident to the normal conduct of the bank's
business. The bank, therefore, must bear these expenses as
a cost of doing bank business. *United States v. Friedman,* 532
F.2d 928, 937-938 (3d Cir. 1976). The bank presented no evi-
dence to suggest that production of the documents pursuant
to the second subpoena unreasonably interfered with its
operations or placed an undue burden on its finances. There-
fore, we will not condition compliance with the limited sub-
poena upon respondent's reimbursing the bank for its
expenses originally incurred (original costs) in complying
with the second subpoena.[6]

The additional expenses the bank will incur (additional
costs) to comply with the limited subpoena, however, are a
different matter. The bank argues that since NCBA had
objected to the first subpoena on the basis of infringement of

---

[6] In support of its claim for its original costs with regard to the second subpoena, the bank
alleges that its employees expended 170 hours to locate and photocopy 20,153 documents as
commanded by the second subpoena. The bank has submitted to respondent a Form 6863 (In-
voice and Authorization for Payment of Administrative Summons Expenses) in the amount of
$5,475.60 for the costs it incurred to produce the documents identified in the second subpoena.
The bank alleges that it has not received payment for the costs reported on Form 6863.

its members' First Amendment associational rights in October 1991 (even before the identical second subpoena was issued to the bank), respondent should have known that NCBA would challenge the scope of the second subpoena on the same grounds. In addition, the bank argues that as a result of earlier cases involving NCBA/NCE, respondent knew or should have known that respondent would be required to demonstrate a compelling state interest in order to justify disclosure of the identities of NCBA members. *Pleasant v. Lovell,* 876 F.2d 787, 795 (10th Cir. 1989); *In re First National Bank, Englewood, Colo.,* 701 F.2d 115, 118 (10th Cir. 1983). The bank points out that despite the fact that respondent was aware of the aforementioned facts and circumstances, respondent nonetheless issued the second subpoena without regard to the First Amendment interests of NCBA's members. As a result, the bank argues, through no fault of its own, in order to comply with the limited subpoena, it is faced with a duplication of expense and effort which could have been avoided. *Stern v. Commissioner,* 74 T.C. at 1086. We agree. The bank is not a party to the instant litigation and will reap no benefit from the production of the documents. Requiring the bank to screen the documents is unavoidable since allowing respondent to screen the documents, as suggested, would not provide any First Amendment protection to NCBA's members.

Under these circumstances, we believe that it is proper for respondent to reimburse the bank for the additional costs it will incur. These additional costs are not reasonably incident to the normal conduct of the bank's business. In addition, given the cost of such duplicative work and the extent to which the bank must now re-compile and re-sort over 20,000 documents in order to comply with the limited subpoena, we feel that under the facts and circumstances analysis prescribed in *Stern v. Commissioner, supra,* the payment of costs by respondent to the bank is warranted. As a result, we will condition compliance with the limited subpoena upon respondent's reimbursing the bank for reasonable additional costs incurred to comply with the limited subpoena.

The bank states that it will have to hire additional full-time staff to screen the 20,153 documents produced pursuant to the second subpoena unless it is given at least 90 days from the date of any order limiting the scope of the second

subpoena to comply therewith. In order to allow the bank to comply with the limited subpoena and incur the least possible expense, we shall order that the bank will have at least 90 days to comply with the limited subpoena. Since we shall order that the bank has at least 90 days to comply with the limited subpoena, we shall order respondent to remit $680 (80 hours of labor at $8.50 per hour) to the bank, the sum the bank indicated that it would have to expend as additional costs in order to comply with the limited subpoena.

To reflect the foregoing,

*Appropriate orders will be issued.*