HEINOLD HOG MARKET,
INC., Plaintiff,

v.

Dennis J. McCOY a/k/a Denny McCoy; Janet E. McCoy a/k/a Janet McCoy, et al., Defendants,

and

George HERRMANN, Plaintiff,

v.

LIBERTY NATIONAL BANK & TRUST COMPANY, et al., Defendants,

Larry D. Martin and John E. Grandbouche, Witnesses-Appellants.

No. 83–1090.

United States Court of Appeals,
Tenth Circuit.

Feb. 18, 1983.

---

William A. Cohan, Denver, Colo., for witness-appellant Larry D. Martin.

Cecil A. Hartman, Englewood, Colo., for witness-appellant John E. Grandbouche.

Efrain Rivera, Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Civ. Div.; C. William Lengacher, Atty., Civ. Div., Dept. of Justice, Washington, D.C.; Robert N. Miller, U.S. Atty., and Janis E. Chapman, Asst. U.S. Atty., on the brief), for appellee U.S. on Behalf of the Farmers Home Admin., U.S. Dept. of Agriculture.

David L. Thomas of Crowe & Dunlevy, Oklahoma City, Okl. (William L. Hunnicutt of Sherman & Howard, Denver, Colo., with him on the brief), for appellee Madill Bank & Trust Co.

Before McKAY, LOGAN, and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

This appeal arises out of ancillary discovery proceedings in the district court for the District of Colorado. The underlying litigation was commenced in federal district court in Oklahoma by Madill Bank & Trust Company and the Farmers Home Administration (FmHA) in connection with loans made by the bank and FmHA to Dennis and Janet McCoy. Discovery in the primary litigation revealed that the McCoys were disposing of collateral pledged as security for the promissory notes and assigning the proceeds directly to the National Commodity Exchange (NCE). The NCE was making payments to certain of the McCoys' other creditors through the NCE's bank account at the First National Bank of Englewood, Colorado. Also, in one of the underlying cases, a federal judge ordered the McCoys to open an escrow account with a banking institution and deposit therein all proceeds of the sale of collateral. Contrary to the court's order, the McCoys opened the escrow account with the NCE. The NCE is identified as a "service wing" of the National Commodity and Barter Association (NCBA), an organization devoted to tax reform.

All parties admit that the NCBA is an unincorporated association. Members of that association can avail themselves of the services of the NCE, a self-described "warehouse bank." These members send their federal reserve notes to the NCE, which converts the notes into silver and gold. Thereafter, when directed by a payout authorization signed by a customer, the NCE reconverts the silver and gold into federal reserve notes and makes payment directly to the customer's designated creditors. NCE literature claims that the NCE protects customer privacy "by providing a bill-

paying service through which you can pay your creditors without generating a paper trail in the Federal Reserve System which is traceable back to you." R. I, 115. That same literature declares that "should the N.C.E. receive an order from a court of competant [sic] authority directing that records of an account-holder be turned over to the I.R.S., etc., the legal resources of the N.C.B.A. will fight the order." R. I, 116.

In an effort to discover the value of existing accounts of the McCoys with the NCE and to trace proceeds of property pledged as collateral to the bank and FmHA loans, the bank and the FmHA obtained subpoenas in the District of Colorado directed to "LARRY D. MARTIN, National Commodity Exchange" and to "NATIONAL COMMODITY AND BARTER ASSOCIATION" seeking testimony and production of all documents reflecting "in any way transactions by and between National Commodity and Barter Association, National Commodity Exchange, or Larry D. Martin, and the McCoys." Martin was specified because his name appeared on NCE documents obtained from the McCoys. Martin gave a deposition on November 12, 1982. Martin admitted that the NCE records were in his custody but did not produce them, asserting the Fifth Amendment privilege against self-incrimination. Martin is a target of a federal grand jury investigation into the activities of the barter exchanges. The NCBA made no formal appearance at first, but John E. Grandbouche, the "founder-director" of the NCBA and the NCE, ultimately was deposed. Grandbouche produced no records, claiming that he did not possess, nor have access to, any relevant documents.

At the final contempt hearing in the district court, Martin asserted that the NCE was his single proprietorship business and that he was entitled to claim a Fifth Amendment privilege against self-incrimination with respect to its records. The court rejected this claim, finding that the NCE was an unincorporated association and not a single proprietorship. The court also rejected Grandbouche's contentions that he could not produce the documents, reasoning

that the NCE was closely aligned to the NCBA and that Grandbouche, as founder of the NCBA and the NCE "and as the person who gives authority to Mr. Martin to control these records of the NCE," R. III, 51, had authority to require the release of the records. Both Martin and Grandbouche are in jail for contempt of court pending the outcome of this appeal.

■ We first consider Martin's right to claim the Fifth Amendment privilege with respect to records of the NCE. The NCE literature demonstrates some misunderstanding of the law by its claim that it can protect customers' wealth and privacy "because the N.C.E. is NOT incorporated, is NOT a limited partnership, does NOT have a business license or other sanction from a government agency. The N.C.E. is a COMMON LAW business which is outside the jurisdiction of the governmental agencies that would deprive you and the N.C.E. of our right to privacy." R. I, 116. The privilege against compulsory self-incrimination is "limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records." *United States v. White,* 322 U.S. 694, 701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944). Thus, if the NCE is any kind of association or entity having more than one individual owner or member, the Fifth Amendment privilege may not be asserted to avoid production of its records. *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974).

■ We must ascertain whether the record supports the finding that the NCE is an unincorporated association. In his November 18 deposition Martin testified that he was "an associate" of the NCBA, R. I, 34; that the NCE is a "private warehouse exchange bank for members of the National Commodity and Barter Association," R. I, 35; that no one is in charge of all of the activities of the NCE, R. I, 37; and that "each member of the [NCE] is responsible" for activities involving himself or herself, R. I, 38. Martin referred to "members of the National Commodity Exchange." R. I, 41;

see also id. 44, 58, 59, 62. In addition to referring to "members" of the NCE, Martin frequently resorted to the plural "we" or similar indications of other people being involved. R. I, 60, 63, 64, 66, 67. Finally, Martin stated flatly, "I don't think the National Commodity Exchange can own anything. It's an unincorporated association." R. I, 58. Martin indicated that there is no principal officer of the NCE and that there are other agents besides himself. R. I, 72. Not until the final contempt proceeding did Martin claim that the NCE was a single proprietorship of which he had 100% ownership. Even during this testimony, Martin declared that there were five other people who conduct activities of the National Commodity Exchange. R. III, 21.

In view of Martin's own testimony and the other testimony and documentary evidence of an affiliation between the NCBA and the NCE, the court's finding that the NCE was not a sole proprietorship is supported by the record. We therefore affirm the determination that Martin must produce the records of the NCE, which he admits are in his custody.

Grandbouche did not assert a Fifth Amendment claim. Rather, he declared that the NCBA had no records involving the McCoys and that neither the NCBA nor he had any authority to order the NCE or Martin to produce records. In his deposition and in court Grandbouche admitted that he is the founder and director of the NCBA and the NCE and that he developed the concept of converting federal reserve notes into gold and silver, which is the work of the NCE. Nevertheless, he testified that he did not have access to NCE records.

"A. Because of the nature of the way it was structured so that none of us could come to an individual in the association knowing the other person's business, and that's the way we have operated.
Q. But Mr. Martin could do that?
A. He would be the only one who could do that.
Q. And the records belong to the NCE; is that correct?
A. That's correct.
Q. Which is merely a service wing, if you will, of the National Commodity and Barter Association?
A. That's correct.

. . . . .

Q. What is your role as founder, director of NCE?
A. Founder, as the overall concept. Director in assigning and that is what I meant when I was in court the other day, and that was misinterpreted, and I gave this responsibility to Mr. Martin. It was his responsibility from that time on, and none of us have any authority to go in there and ask any questions about any client whatsoever. That is part of the way it's structured.
Q. Now, you say you gave this authority to Mr. Martin; is that correct?
A. That's correct.
Q. Could you take that authority away from Mr. Martin?
A. No, I didn't.
Q. Could you?
A. No, I couldn't.
Q. Who could?
A. No one could.
Q. You gave him an irrevocable grant to authority?
A. That's correct. See, we have the uniqueness—so that you understand this better—having these warehouse banks anywhere, and they would all have the same property of irrevocable. It's up to them to take care of their own business. Otherwise the whole idea doesn't work.
Q. And why was Mr. Martin given this authority?
A. Because I assigned it to him. No other reason."

R. IV, 8–9. After considering this testimony the trial court found that Grandbouche had authority to control NCE records and ordered him jailed until he produced those records or ordered Martin to do so.

 We agree with those courts holding that in a civil contempt action the proof of contempt must be clear and convincing. See Vertex Distributing, Inc. v. Falcon

*Foam Plastics, Inc.,* 689 F.2d 885, 889 (9th Cir.1982); *N.L.R.B. v. Blevins Popcorn Co.,* 659 F.2d 1173, 1183 (D.C.Cir.1981); *In re Irving,* 600 F.2d 1027, 1037 (2d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976); *Telling v. Bellows-Claude Neon Co.,* 77 F.2d 584, 585 (6th Cir.1935). The plaintiffs adduced, primarily through Grandbouche's own testimony, evidence of Grandbouche's prior control of the NCE and evidence strongly implying his continuing involvement in the organization. First, Grandbouche admitted that he was the founder of the NCBA and the NCE and once had authority over NCE records. Second, Grandbouche is the only person identified on the stationery of the NCBA. This stationery identifies him as founder/director of the NCBA and lists the NCE as an affiliated service organization. Grandbouche admits that the NCE was his brainchild and that he delegated to Martin the authority over the NCE's records. The NCE literature quoted above states that the legal resources of the NCBA will be used to back the NCE. This evidence supports the inference that Grandbouche has a continuing relationship with the NCE, and, when taken with the showing that the subpoena was lawfully issued and that Grandbouche failed to comply, constitutes a prima facie case of contempt.

In light of this evidence, if Grandbouche was to avoid the contempt citation he was required to come forward with concrete, specific evidence of his lack of control over NCE records. We approve the test enunciated by the Ninth Circuit:

"In a civil contempt proceeding, the proof of contempt must be clear and convincing. To make a prima facie showing of contempt, however, the government need prove only that the defendant has failed to comply with a valid court order. It need not prove that the defendant is able to comply.

. . . . .

[T]he defendant [then bears] a burden of production. This burden is normally satisfied when the defendant produces suffi-

cient evidence of his inability to comply to raise a question of fact. The burden of persuasion remains on the government, but what may be required to sustain the burden varies according to the evidence produced by the defendant. Initially, the government need persuade the court only that the defendant has failed to comply with a valid court order. Once the defendant has produced detailed evidence regarding his inability to comply with the order, the government has the additional burden of persuading the court that the defendant actually is able to comply."

*United States v. Rylander,* 656 F.2d 1313, 1318 (9th Cir.1981) (citations and footnote omitted), *cert. granted,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed. 464 (1982). *See generally United States v. Bryan,* 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) ("Ordinarily one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply.").

Grandbouche said that he no longer had the authority to direct Martin because "[t]hat is part of the way it's structured"; he said that his grant to Martin was "irrevocable" because "[o]therwise the whole idea doesn't work." Grandbouche's duty to provide detailed, specific evidence, however, demanded more than simple denials or vague characterizations of his relationship to the NCE. The mere declaration that delegations of authority are irrevocable, that secrecy will be observed, that no one will have access to records, and that legal process thus can be avoided does not make it so. Whenever people band together for a particular purpose, the law determines what obligations they owe one another and what rights are possessed by outsiders who deal with the organization or who have a lawful interest in a participant's property held by the organization.

In Colorado, an unincorporated organization formed to conduct business for profit is characterized as a partnership. *See Fisher .v. Colorado Central Power Co.,* 94 Colo. 218, 29 P.2d 641, 642 (1934). Under the Uniform Partnership Act, which is in effect in Colorado, "every partner shall at all times have

access to and may inspect and copy any [partnership records]." Colo.Rev.Stat. § 7–60–119. The NCE has the appearance of a business operated for profit. It charges for its services; it buys and sells silver and gold; it assumes the risk of declines in the market prices of these commodities and recoups its losses from account holders when prices increase. Even if the NCE is a nonprofit unincorporated association, Colorado law permits suit to enforce "against it a substantive right," and outsiders may reach "the joint property of the associates, and the separate property of any individual member" over whom the court has jurisdiction.[1] With respect to the right of access to records of a nonprofit unincorporated association, ordinary agency principles apply. Members of the organization's governing body, if there is one, control the access to records of the organization. *See United States v. Fleischman,* 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950). If the organization has no governing structure at all, all members or participants have equal access to the organization's records, as is the rule for partnerships.

An important purpose underlying shifting the burden of production is to place on the person most likely to have access to the relevant evidence the obligation of bringing it forward.[2] The record in this case highlights the utility of this rule. The only relevant document in the record explaining the operation of the NCE declares explicitly that the NCE is set up to avoid scrutiny by the Internal Revenue Service and others and to provide a bill paying service that leaves no paper trail through the Federal Reserve System (even NCE's cancelled checks representing payment of bills for its account holders are destroyed after 90 days). To avoid taxation and scrutiny from any source, Grandbouche designed an "unincorporated association" apparently with no formal governing structure, oral irrevocable delegations, and no paper records (except the "Common Law" contract, the ledger showing gold and silver balances, and checks that cleared within the last 90 days). The NCE, then, is an organization designed to operate in secrecy, to leave no paper trail, and to avoid service of process. Given

1. Colo.Rev.Stat. § 13–50–105 states:
 "A partnership or other unincorporated association may sue or be sued in an action in its common name to enforce for or against it a substantive right; except that in such action only the property of the partnership or other unincorporated association, the joint property of the associates, and the separate property of any individual member thereof who is named as a party individually and over whom individually the court has acquired jurisdiction either by entry of appearance or by service of process may be bound by the judgment therein."

2. In *United States v. Fleischman,* 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950), the contemnor, who admitted that she was a member of the executive board of an unincorporated association and that the board had power over association records, refused to produce the records on the ground that they were not in her personal possession or control. The Court rejected this argument. In discussing the burden of proof in her contempt trial the Court said:
 "We think that the circumstances of this case fairly bring into play the familiar doctrine in criminal cases that 'it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which if untrue

could be readily disproved by the production of documents or other evidence probably within the defendant's possession or control.'

In this situation, manifestly, the prosecution is under a serious practical handicap if it must prove the negative proposition—that respondent did not or had no good reason for failing to try to comply with the subpoena insofar as she was able. The possibilities of time and circumstance are of such wide range as to defy inclusive rebuttal. On the other hand, the burden of the affirmative was not an oppressive one for respondent to undertake; the relevant facts are peculiarly within her knowledge. She was called upon merely to introduce evidence as to what steps she took after receiving the subpoena, or, if she took no action, any evidence tending to excuse her omission.

This conclusion is buttressed by the fact that such a burden ordinarily is cast upon members of the governing boards of corporations and associations which have not complied with court orders, when they are brought into court on contempt charges." *Id.* at 360–63 & n. 10, 70 S.Ct. at 745–46 & n. 10.

this emphasis on secrecy, requiring Grandbouche to present specific evidence of his inability to control the records is particularly justified.

"[P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned."

*United States v. Bryan,* 339 U.S. at 331, 70 S.Ct. at 730.

The plaintiffs' proof, in light of Grandbouche's failure to meet his burden of production, adequately supports the trial court's conclusion.

AFFIRMED.