843 F.Supp. 655 (1993)
NATIONAL COMMODITY AND BARTER ASSOCIATION/NATIONAL COMMODITY EXCHANGE, Plaintiff,
v.
UNITED STATES of America, Defendant.
Civ. A. No. 89-M-1912.
United States District Court, D. Colorado.
October 22, 1993.
*656 William A. Cohan, Jennifer A. Greene, Cohan & Greene, Encinitas, CA, for plaintiff.
Seth G. Heald, Office of Special Litigation, Tax Div., U.S. Dept. of Justice, Washington, DC, William G. Pharo, Asst. U.S. Atty., Denver, CO, for defendant.

MEMORANDUM OPINION AND ORDER
MATSCH, District Judge.
The National Commodity and Barter Association/National Commodity Exchange (NCBA/NCE) brings this suit against the United States for a refund of penalties assessed under I.R.C. § 6698 for failing to file partnership returns for the years 1979-1988 and I.R.C. § 6700 for promoting an abusive tax shelter. This court has jurisdiction over the matter pursuant to I.R.C. § 7422 and 28 U.S.C. § 1346(a)(1). A trial to the court was held November 16-19, 1992 and December 30, 1992. Extensive post-trial briefs were filed. This memorandum opinion constitutes the findings of fact and conclusions of law required by F.R.Civ.P. 52(a).
The NCBA, founded in 1979, is a self-described "voluntary, non-commercial, political and educational association." Amended *657 Cmplt. ¶ 1. The NCBA operated a warehouse bank or warehouse exchange known as the National Commodity Exchange, or NCE. On April 5, 1985, the IRS levied a $20,000,000 jeopardy assessment against the NCBA pursuant to I.R.C. § 6700 for promoting an abusive tax shelter by disseminating false and fraudulent statements concerning the federal tax laws. Concurrent with the jeopardy assessment, under a search warrant, the IRS conducted a search and seizure at the NCBA's offices in Denver, Colorado, seizing cash and coins, as well as gold and silver bullion. The IRS also placed levies against NCBA bank accounts. Though the search and seizure was held unconstitutional, see Voss v. Bergsgaard, 774 F.2d 402, 406 (10th Cir.1985), the IRS served a levy on itself and retained the NCBA's assets to satisfy the $20,000,000 jeopardy assessment. On March 2, 1988, the NCBA filed a claim for refund with the IRS. This action was filed more than six months subsequent to that date on November 2, 1989 pursuant to I.R.C. § 6532(a)(1).
On June 22, 1990, the IRS assessed $4,223,000 in penalties against the NCBA under I.R.C. § 6698 for failing to file informational partnership tax returns for the years 1979-1988. By a letter dated January 31, 1991, the IRS notified the NCBA that it had abated the § 6700 penalty to $176,822 after a number of courts had disapproved the method by which the penalty was calculated. See, e.g., Gates v. United States, 874 F.2d 584, 587 (8th Cir.1989). Under the new computation method, the IRS penalized the NCBA/NCE based on a percentage of its gross income, which the IRS determined to be $1,384,226 for the years 1982-1985. The IRS applied the overpayment from the § 6700 abatement to the § 6698 penalties, notifying the NCBA by a letter dated April 18, 1991. The NCBA/NCE filed a claim for refund for the § 6698 penalties for the years 1979-1983 on June 15, 1992. The IRS disallowed the claim in a July 24, 1992 letter. An amended complaint seeking refund of the § 6698 penalties was filed in this court on August 7, 1992. The amended complaint also seeks an injunction against the IRS to keep it from enforcing the § 6698 penalties for 1984-1988.
The NCBA/NCE was conceived by John Grandbouche, a onetime candidate for lieutenant governor of Colorado and full-time proponent of libertarian and anti-monetarist ideas. After Grandbouche's death in 1986, John Voss took over as director of the NCBA. The NCBA recruited members and charged annual membership fees ranging from $100 to $180 over the course of the 1980s. It also had honorary members who were not charged membership fees. The NCBA began with about 200 members in 1979. Membership peaked near 2,000 in the early 1980s, but has declined since then on account of the 1985 seizure of the NCBA's assets. At the time of the search and seizure in 1985, the NCBA had approximately 1700 members.
NCBA membership brought certain benefits. NCBA members received a multi-volume set of loose-leaf "Freedom Books." The "Freedom Books" outlined the premises of the NCBA credo, and provided guidance for defending against tax audits and conducting pro se tax litigation. The first volume sets forth the fundamental tenets of the NCBA. Among those tenets are beliefs: that the originally conceived Constitutional system has been perverted; that the Federal Reserve is an extraconstitutional agency serving the interests of plutocratic banking interests; that the United States is headed for financial ruin because it has abandoned the gold standard; that the federal income tax is unconstitutional; and, specifically, that wages are not subject to taxation because they are not income. The second volume of the Freedom Books is entitled "Legal Briefs and Motions." The volume is a primer for conducting pro-se litigation and details the state and federal court systems and the process of litigation. The third volume, entitled "Courtroom Procedures," gives the NCBA's views on federal court jurisdiction, the role of grand juries and how to appeal an adverse tax ruling.
The Freedom Books also describe the purported advantages of warehouse banking. According to the Freedom Books, warehouse banks back deposits with `real' assets  gold and silver  and additionally afford depositors absolute privacy against the recordkeeping *658 requirements of the IRS. In practice, the warehouse bank described by the Freedom Books was the NCE, the "service wing" of the NCBA. The NCE was a warehouse bank created, according to NCBA literature, to function outside of the illegitimate Federal Reserve System and invasive federal banking and tax laws. It was open only to NCBA members. The NCE did what the Freedom Books promised: The NCE converted depositors' Federal Reserve Notes (or "F[e]rns") into gold or silver. The NCE also claimed to give depositors complete privacy in conducting their personal finances. Accounts were numbered, not named. Account records were kept purportedly only for the immediately preceding NCE transaction. The NCE's promotional literature claimed account-holders' records would be beyond the reach of the IRS. Records on computer tape seized by the government show 679 separate accounts at the NCE. Most of the accounts were held by individuals, but some accounts belonged to other warehouse exchanges located about the country.
The NCE maintained checking accounts at several banks in the Denver area. It used depositors' money to purchase precious metals, and held depositors' assets in that form. The NCE also had in place a "price stabilization plan" to protect account-holders' assets from price fluctuations in the precious metals market. This plan required the maintenance of a reserve fund from which the NCE could absorb any losses an account-holder might incur if the price of metals dropped. When an account-holder wanted to withdraw money from his account, he would notify the exchange. The exchange would then send the account-holder cash via registered mail. Alternatively, the NCE offered a bill paying service, whereby account-holders would notify the exchange of bills they had to pay and to whom. The NCE would then write checks to those parties on the NCE's own account.
The NCE was initially operated by NCBA member Larry Martin. A dispute with Grandbouche in April 1983 over opening up the NCE to non-NCBA members led to Martin's departure. Martin's successor at the NCE was Joseph Gorman, who ran the exchange until March 1985. Gorman also had a falling out with Grandbouche and the NCBA, so much so that he took NCE's backup computer records and turned them over to the government.
The NCBA charged fees to users of the NCE. Joseph Gorman testified that $6000 per month of the service fees were deposited into an NCE account known as the "Founder's Fund." The remainder of the NCE's fees were kept by Gorman to maintain a reserve fund for the NCE, and to pay expenses. The Founder's Fund was under the sole control of John Grandbouche, who used the Founder's Fund deposits to further the mission of the NCBA as he saw fit. Founder's Fund money paid for a variety of NCBA activities, including the development of a high-mileage carburetor, publishing John Grandbouche's books and, after Grandbouche's death, paying his widow's expenses. John Voss assumed control of the Founder's Fund upon succeeding Grandbouche at the NCBA.
The NCE was one of a network of warehouse banks located throughout the country. Joseph Gorman testified that 63 "satellite" exchanges were established through NCBA members. These members paid to attend NCBA training seminars on running warehouse banks. Many of these satellite exchanges maintained accounts with the NCE and traded metals through the NCE.
The NCBA also circulated a monthly newsletter to members. Non-members could subscribe for $15, and later $20, per year. The newsletter covered topics ranging from the efforts of the NCBA movement, to home schooling, to pleas for aid for incarcerated tax offenders, to efforts to develop a high-mileage carburetor, to advertisements for books sold by the NCBA. The NCBA hosted annual seminars for members starting in 1981 and continuing until 1985. At these conclaves, Grandbouche, Voss and other NCBA representatives instructed concerning NCBA teachings.
Yet another activity of the NCBA involved the operation of a "legal department." The legal department charged members $25 and later $40 per hour for assistance to members involved in tax audits and litigation. A "Mutual Assistance Plan" (MAP) was also offered *659 by the NCBA, which functioned as a sort of litigation insurance plan for members involved in civil and criminal tax disputes. The MAP covered an enrollee's litigation expenses up to certain dollar amounts using preapproved NCBA attorneys. In a 1984 promotional videotape, then NCE head Joseph Gorman claims 22 to 23 percent of the NCBA's members were participating in the MAP program.
As this description of NCBA activities indicates, part of the central mission of the organization was resistance to the tax regime. The NCBA and its members have been involved in many federal cases, both civil and criminal. See, e.g., Aspinall v. U.S., 1993 WL 97611 (D.Colo.1992), aff'd, 984 F.2d 355 (10th Cir.1993); U.S. v. Becker, 965 F.2d 383 (7th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1411, 122 L.Ed.2d 783 (1993); U.S. v. McKinney, 952 F.2d 333 (9th Cir.1991); National Commodity and Barter Ass'n v. U.S., 951 F.2d 1172 (10th Cir.1991); National Commodity and Barter Ass'n, National Commodity Exchange v. Gibbs, 886 F.2d 1240 (10th Cir.1989); Hintze v. I.R.S., 879 F.2d 121 (4th Cir.1989); Pleasant v. Lovell, 876 F.2d 787 (1989); C.I.R. v. Hendrickson, 873 F.2d 1018 (7th Cir.1989); U.S. v. Stelten, 867 F.2d 446 (8th Cir.1989), cert. denied, 493 U.S. 828, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989); In re Grand Jury Proceeding, 842 F.2d 1229 (11th Cir.1988); Voss v. Bergsgaard, 774 F.2d 402 (10th Cir.1985); Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611 (10th Cir. 1983); U.S. v. Pottorf, 828 F.Supp. 1489 (D.Kan.1993); U.S. v. Holland, 830 F.Supp. 1388 (N.D.Okla.1993); National Commodity & Barter Ass'n v. Gibbs, 790 F.Supp. 233 (D.Colo.1991); Pleasant v. Lovell, 1990 WL 393737 (D.Colo.1990), aff'd, 974 F.2d 1222 (10th Cir.1992); U.S. v. National Commodity and Barter Ass'n, 1990 WL 85905 (D.Colo. 1990); Huebner v. U.S., 731 F.Supp. 1441 (D.Ariz.1990); U.S. v. Gorman, 674 F.Supp. 1401 (D.Minn.1987); In re Roberts, 650 F.Supp. 159 (N.D.Ga.1987); National Commodity and Barter Ass'n v. U.S., 625 F.Supp. 920 (D.Colo.1986); U.S. v. Premises Known as 1007 Morningside Ave., Sioux City, Iowa, 625 F.Supp. 1343 (N.D.Iowa 1985); Grandbouche v. C.I.R., 99 T.C. 604, 1992 WL 349739 (1992). Government exhibit G-11, introduced at trial, catalogs correspondence between presence on NCBA membership and mailing lists with conviction for federal tax related crimes or assertion of frivolous positions in federal tax cases. 401 individuals appearing on the NCBA rolls have been either criminal defendants in tax cases, or have asserted frivolous legal positions in civil tax matters. Nearly half of these individuals had disputes with the IRS before joining the NCBA or before the NCBA was even formed.
The NCBA/NCE did not file federal partnership, corporation, employment or unemployment tax returns from 1979-1988. Neither did the NCBA obtain an IRS ruling that it was a non-profit or tax-exempt organization under I.R.C. § 501 or a political organization under I.R.C. § 527.

I. Subject matter jurisdiction
The government initially argues that the NCBA is precluded from arguing many of its positions because it failed to raise them in the § 6698 refund claim. At trial, the NCBA argued it was a sole proprietorship of John Grandbouche, and after Mr. Grandbouche's death, John Voss became the sole proprietor. Alternatively, the NCBA argued that it was a political party under I.R.C. § 527.
The government claims that these two positions were not raised in the NCBA's claim for refund filed with the IRS and thus this court is without subject matter jurisdiction to entertain those arguments. I.R.C. § 7422(a) requires that prior to maintaining a suit in a district court, a taxpayer must first file a claim for refund with the IRS "according to the provisions of law in that regard, and the Regulations of the Secretary in pursuance thereof." One such regulation requires that a claim for refund must "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402-2(b)(1).
In Herrington v. United States, 416 F.2d 1029, 1032 (10th Cir.1969), the Tenth Circuit Court of Appeals ruled that a taxpayer seeking a tax refund could not raise legal or *660 factual bases for a refund that were not originally raised in the claim for refund filed with the IRS. See also, Angle v. United States, 996 F.2d 252, 254 (10th Cir.1993); United States v. Felt & Tarrant Mfg., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); Angelus Milling Co. v. Commissioner, 325 U.S. 293, 299, 65 S.Ct. 1162, 1165, 89 L.Ed. 1619 (1945). For a court to have jurisdiction under § 7422, Herrington requires that: "[T]he grounds relied on in a suit for refund must be reasonably encompassed by those set out in the claim for refund." Id. at 1032. The IRS can waive this formal requirement, but can do so only by addressing the merits of the claim asserted. Angelus, supra, 325 U.S. at 297, 65 S.Ct. at 1164. The purpose of this principle is to provide the IRS with adequate information to consider claims and thus avoid the expense of unnecessary litigation. Felt & Tarrant Mfg., 283 U.S. at 272, 51 S.Ct. at 377. Thus this "variance doctrine," as it is called, functions akin to the procedural default rule in appellate litigation: the claimant here must have already raised its bases for refund in the IRS refund action, or this court is without jurisdiction.
An examination of the NCBA's § 6698 refund claim (Govt. exhibit K-9) reveals that the NCBA did sufficiently apprise the IRS of these asserted grounds for refund. The NCBA refund claim is suffused with references to its political and ostensibly protected First Amendment activities. Indeed, in a motion for injunction filed in this court and attached to the refund claim, the NCBA accuses the IRS of levying the penalty because of the NCBA's political activities. In sum, the government cannot credibly maintain that the NCBA's refund claim did not apprise it of the NCBA's assertion at trial that it is a political organization. Admittedly, the NCBA's refund application does not explicitly mention I.R.C. § 527, defining the tax status of political organizations, but Herrington only requires the bases asserted in court be "reasonably encompassed" in the IRS refund claim. The NCBA's assertion that it is a political organization is so reasonably encompassed.
Similarly the IRS had notice in the refund claim of the position that the NCBA was the sole proprietorship of John Grandbouche. Indeed the government previously maintained that the NCBA was Grandbouche's sole proprietorship. The government claims that the NCBA never took this position in the refund claim, but rather only cited the government's position in other tax court litigation. Examining the claim for refund, it is sufficiently clear that the NCBA informed the IRS reviewer of the IRS' previously held position on the status of the NCBA.
This procedural default-type doctrine is "implicit," not explicit in § 7422. Herrington, 416 F.2d at 1032. "[T]he manifest purpose of the requirement [that parties state their ground for refund] is to afford the Service an opportunity to consider and dispose of the claim" with less expense and time. Id. The NCBA's stated grounds in the complaint gave the IRS an opportunity to consider the "NCBA-as-sole proprietorship" argument. Indeed the IRS itself hatched the argument. The NCBA seems to abandon the position that it was a sole proprietorship in its post-trial brief, so the jurisdictional question may be of no consequence. All the same, this court rules that it does have jurisdiction to entertain the proposition that the NCBA was a sole proprietorship for federal tax purposes.

II. The § 6698 penalty
The pertinent question for the § 6698 is whether the NCBA/NCE was a partnership for federal income tax purposes. Since IRS has determined a partnership exists, and that determination is supported by a presumption of correctness, the burden is borne by the NCBA to prove that the determination was erroneous. Commissioner v. Tower, 327 U.S. 280, 286 n. 4, 66 S.Ct. 532, 535 n. 4, 90 L.Ed. 670 (1946), citing, Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8,78 L.Ed. 212 (1933).
Obviously, a § 6698 penalty for failure to file a partnership return, can only be imposed against a partnership. I.R.C. § 761(a) defines a partnership for federal tax purposes:
[T]he term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by *661 means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation, a trust or an estate.
The breadth of this definition is underscored by the Treasury Department's gloss on I.R.C. § 761(a): "[t]he term partnership is broader in scope than any common law meaning of partnership, and may include groups not commonly called partnerships." 26 C.F.R. § 1.761-1(a).
For purposes of Colorado law, the NCBA has been called a partnership. Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611, 615 (10th Cir.1983). This very court has characterized the NCBA as a partnership. National Commodity and Barter Exchange v. United States, 625 F.Supp. 920, 924 (D.Colo.1986) (Matsch, J.). Nevertheless, the NCBA's status under the internal revenue code is ultimately a fact-based determination to be made by this court on the facts presented at trial. Commissioner v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949). A determination of an entity's status as a partnership under state law does not foreclose a contrary determination for federal tax law purposes. Id. at 753, 69 S.Ct. at 1219 (Frankfurter, J., concurring).
First, let it be said what the NCBA was not. The NCBA never incorporated under the laws of any state thus it is not subject to taxation as a corporation. Nor, quite obviously, is the NCBA subject to taxation as an estate, or a trust. I.R.C. § 7701(a).
The text of § 761(a) supports the proposition that the NCBA is a partnership. The NCBA cannot escape the fact that it is a "syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on...." The NCBA certainly was a "group," or, at the least, an "other unincorporated organization." A "group" has been defined as "a number of individuals bound together by a community of interest, purpose or function." Webster's Third New International Dictionary 1004 (1971). The NCBA was precisely one such community of interest, advocating specific views regarding taxes and the constitutional order. At the very least, the NCBA was an "other unincorporated association." The breadth of the statutory term indicates it was designed as a catch-all so as to encompass consciously amorphous associations such as the NCBA.
Furthermore, operation of the NCE constituted a "financial operation." The NCE bought and sold gold and silver, paid members' bills through NCE accounts, charged fees for services, and maintained a price support system for depositors. In short, the NCE performed many of the services of a traditional bank. It was, unequivocally, a "financial operation." Moreover, the NCBA received revenue from memberships, the MAP, the legal department and sales of publications. Admittedly, none of these activities seemed to be carried out in the fashion of a for profit commercial enterprise, but § 761(a) contains no such requirement. By its terms alone, the statute encompasses an organization such as the NCBA/NCE.
The NCBA does not substantially dispute that the broad terms of I.R.C. § 761(a) capture it within, what it calls, the IRS "pigeonhole" of a partnership. Rather, the NCBA turns to court interpretations of what constitutes a partnership. The definition of a partnership in the case law is considerably more restricted than the inclusive terms of I.R.C. § 761(a). The Supreme Court described a partnership as:
[W]hen persons join together their money, goods, labor or skill for the purpose of carrying on a trade, profession, or business and when there is a community of interest in the profits and losses.
Commissioner v. Tower, 327 U.S. 280, 286, 66 S.Ct. 532, 535, 90 L.Ed. 670 (1946), citing Ward v. Thompson, 22 How. 330, 333, 334, 16 L.Ed. 249 (1859). In Culbertson, 337 U.S. at 743, 69 S.Ct. at 1214, the Supreme Court articulated an intent test as to whether a partnership exists; namely, whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Id. The Court also identified the following attributes as manifestations of an intent to create a partnership: *662 the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of the income and the purposes for which it is used, and any other facts throwing light on their true intent....
Id. at 742, 69 S.Ct. at 1214. Luna v. Commissioner, 42 T.C. 1067, 1077-78, 1964 WL 1259 (1964), identifies still other factors germane to determining whether the an entity is a partnership:
the existence of an agreement, the contributions made by each party, the parties' control over income and capital, the right of each party to make withdrawals, the sharing of a mutual proprietary interest in the net profits, an obligation to share losses, receiving contingent compensation in the form of a percentage of income....
When viewed in light of these criteria, the NCBA seemingly begins to edge out of the partnership category.
There was no partnership agreement. NCE members signed agency agreements with the NCBA. See Gov't Ex. A-17. There was not a commonality of interest between members in profits and losses generated by the NCBA. "Profits" in the economic sense  revenue generated by the NCE, book sales and seminars  were either in the sole control of John Grandbouche (and later John Voss) through the Founder's Fund, or used to pay the salaries of NCBA office workers. These profits were not shared by NCBA members, and there was no community of interest between members for these profits. At best, these profits were realized solely by the `inner-circle' of the NCBA, who were paid out of these revenues and made their livelihood at the NCBA.
The government's theory is that the profits NCBA members enjoyed were "saved tax profits;" that is, profits made by not paying income tax on assets ensconced in the NCE or money saved through tax avoidance schemes learned from the NCBA. This theory is unsustainable. For one, there is no evidence that there was a community of interest among all NCBA or NCE members to make "saved tax profits." More importantly, "saved-tax profits" are not what is meant by "profits" under the Internal Revenue Code. Profits generally mean economic profits, not tax savings. See, e.g., Herrick v. Commissioner, 85 T.C. 237, 1985 WL 15378 (1985) ("Profit" means economic, not tax, gains for purposes of I.R.C. § 162(a)); Surloff v. Commissioner, 81 T.C. 210, 1983 WL 14861 (1983); Slifka v. Commissioner, 182 F.2d 345 (2d Cir.1950). Losses sustained by the NCBA because of the price stabilization plan, meanwhile, evince an intent that NCE members be shielded from, not share in, losses sustained by the enterprise. Members with NCE accounts controlled the assets in their own account and no others. The only example of NCBA/NCE assets being pooled was the Founder's Fund, and it was under the sole control of John Grandbouche, and later John Voss.
The lack of profits or a community of interest is not determinative of the NCBA's status for tax purposes. I.R.C. § 761(a) does not require that an entity report profits to be deemed a partnership. In fact, partnerships have often been constituted in order to show losses for the tax benefits.
More to the point, the Supreme Court and tax court cases involved different situations from the one presented here. There the choice was between taxable entities, a partnership on one hand and a specific taxable alternative on the other. Luna, for instance, involved the choice between whether the claimant was in a partnership or an employer-employee relation. 42 T.C. at 1067. In Culbertson, 337 U.S. at 735, 69 S.Ct. at 1211, the choice was between a sole proprietorship and a partnership. Tower, 327 U.S. at 282, 66 S.Ct. at 533, involved attribution of income either to a husband and wife as a partnership, or to the husband solely, as an individual. Here, the NCBA attempts to say it is neither a partnership, nor anything else for purposes of the federal income tax laws. It simply falls through the cracks.
That an entity might fall through the cracks of the revenue code is not inconceivable. It comes down to the question whether the income tax laws encompass the entire universe of economic activity  with the definition *663 of a partnership corralling all outlier entities  or whether there are gaps in the tax code that impose no requirements on entities like the NCBA. The Tower, Culbertson and Luna cases are aimed at a different set of circumstances. The dispute there is whether the taxpayer is to be treated as part of a partnership and be liable for one type of tax liability, or alternatively be held liable as another type of taxable entity. Those cases then are defining the characteristics between formal categories of taxable status, individuals from partnerships, partnerships from agency relations. The language of I.R.C. § 761(a) crucial to this case  defining "group[s]" or "other unincorporated association[s]" as partnerships  is not concerned with the dividing lines between categories of tax status, but was meant to reach out and embrace organizations not contained within the formalistic definitions of the tax code.
The NCBA is one such entity encompassed by this definition and as such was required to file an informational return pursuant to I.R.C. § 6031(a). The amount of economic activity engaged in by the NCE and NCBA  buying and selling metals, selling books, underwriting an insurance program  simply cannot fall through the cracks of the federal tax laws. The consequences of accepting the NCBA's argument that an entity can be organized such that it has no status for purposes of the Internal Revenue Code would be debilitating to the tax system. In no time at all many non-partnerships patterned after the NCBA would spring up to enjoy the significant tax advantages afforded by being amorphous.
The NCBA failed to meet its burden that the IRS erroneously assessed the § 6698 penalty. The deliberate formlessness and secrecy of the NCE, made it reasonable for the IRS to assess this penalty. The NCE was the core of the financial operations, accordingly the partnership could most plausibly be defined as all NCE account-holders. The NCBA provided no way to determine who specifically held accounts at the NCE. Therefore, given that NCBA membership conferred the right to an NCE account, all NCBA members may be considered partners for § 6698 purposes.
The NCBA raised two affirmative attempts at self-definition at trial to escape the "IRS pigeonhole" of being a partnership: 1. the NCBA claimed it was a political organization; and, alternatively, 2. the NCBA claimed to be a sole proprietorship. The evidence revealed neither of these characterizations to be true. The NCBA was neither an exempt political organization as defined by I.R.C. § 527(e)(1-2), or the sole proprietorship of John Grandbouche. The NCBA's involvement with Grandbouche's campaign in 1982 was marginal, at best, and was certainly not its animating purpose. Dissemination of a broad political message, as was done by the NCBA, does not qualify for exemption under I.R.C. § 527(e)(2). Such activity must be directed at efforts for an individual, not diffuse proselytization about an ideology. Furthermore, even if it was a political organization, the NCBA still had an obligation to report "political organization taxable income" as defined by I.R.C. § 527(c). The NCBA certainly generated such income through operation of the NCE.
Likewise, the NCBA was not a sole proprietorship of John Grandbouche. Even the NCBA seems to abandon that position in its post-trial brief. NCBA members' own testimony negates this characterization. John Grandbouche's deposition testimony, admitted at trial, characterizes the NCBA as being governed by its members. John Voss testified that he did not consider the NCBA his sole proprietorship upon taking over as its head. There was simply no convincing evidence that the NCBA was a sole proprietorship.
It should be kept in mind here that all the NCBA was required to do by the Code was file an informational partnership tax return. I.R.C. § 6031(a). The evidence at trial showed that the NCBA made deliberate strides to elude categorization under the revenue code. In the meantime, the NCE was engaging in a substantial amount of financial activity having significant tax consequences. The breadth of § 761(a) captures the NCBA/NCE within it. As such, the NCBA was required to file informational returns with the IRS and could be penalized pursuant to § 6698 for failing to do so.

*664 III. I.R.C. § 6700 refund claim

In pertinent part, I.R.C. § 6700 provides for imposition of a penalty against:
(a)  Any person who 
(1)(A) organizes (or assists in the organization of) 
(i) a partnership or other entity,
(ii) any investment plan or arrangement, or
(iii) any other plan or arrangement, or
(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and
(2) makes or furnishes (in connection with such organization or sale) 
(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, ...
The IRS imposed an initial penalty against the NCBA for $20,000,000, which has since been abated to $176,822. The IRS bears the burden of proving the § 6700 penalty. I.R.C. § 6703(a).
United States v. Savoie, 594 F.Supp. 678, 680-81 (W.D.La.1984), United States v. White, 583 F.Supp. 1118, 1119-20 (D.Minn. 1984), aff'd, 769 F.2d 511, 515-518 (8th Cir. 1985), and United States v. Kaun, 633 F.Supp. 406 (E.D.Wis.1986), aff'd, 827 F.2d 1144, 1147-49 (7th Cir.1987) are cases enjoining the respective defendants pursuant to I.R.C. § 7408 for promoting false and fraudulent schemes to avoid taxes in violation of I.R.C. § 6700.
The defendants in those cases shared many of the positions of the NCBA; for instance: 1. that wages are excludable from gross income; 2. that the income tax is unconstitutional as a direct tax not apportioned among the states; 3. that the duty to pay income taxes is dependent upon receiving a privilege from the government. Savoie, 594 F.Supp. at 681; White, 583 F.Supp. at 1119-20. Each of these positions has been deemed frivolous. See Lonsdale v. United States, 919 F.2d 1440, 1448 (10th Cir.1990).
That the NCBA advocated and advised members positions deemed frivolous by the courts is indisputable. The "Freedom Books," as well as other NCBA pamphlets and promotional materials, presented and counseled readers to assert frivolous tax positions. The NCBA also knew or had reason to know that these positions were frivolous. See Savoie, 594 F.Supp. at 681. The NCBA and its main theoreticians were veterans in advocating resistance to the IRS. While they may adamantly have believed in their righteousness, they also knew that courts have uniformly rejected their teachings.
Turning to the statute, this court has already ruled that the NCBA is a person under § 6700. Next, to be held liable, the NCBA must be found to have "organize[d] (or assist[ed] in the organization of) either, (i) a partnership or other entity, (ii) any investment plan or arrangement, or (iii) any other plan or arrangement." The NCE amounts to the "other plan or arrangement." Finally, the NCBA must have "participate[d] in the sale of any interest in an entity or plan or arrangement previously referred to" and "have made or furnished a statement with respect to the allowability of any deduction or credit, the excludability of any income, or securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, ..." The question becomes whether the NCE represented members could secure a tax benefit "by reason of their participation" in the NCE.
The evidence revealed that the NCBA/NCE did made representations about the tax advantages afforded by maintaining an account. The emphasis on account-holders privacy and common law rights of contract were pointed messages that account-holders could avoid the IRS. This privacy, then, would be an "other tax benefit" gained "by reason of holding an interest" in the NCE. Equally important is evidence of the number of NCBA members convicted of tax crimes. This evidence permits an inference the people *665 joined the NCBA in order to secure tax benefits and that the NCBA, through the vehicle of the NCE, promoted and sold interests in an abusive tax shelter. This court concludes that the government met its burden in proving that the NCBA/NCE is liable for the § 6700 penalty.
The NCBA contends that its materials were mere advocacy and did not approach promotion of an abusive tax shelter. This is not supported by the evidence. Perhaps the NCBA Freedom Books, standing alone, would amount to mere advocacy. But the NCBA went so far as to establish the NCE and tout the privacy it afforded to members. The NCE was clearly established to thwart enforcement of the tax laws, and as such was an abusive tax shelter. The NCBA went far beyond mere advocacy.

IV. Constitutional Challenges
The NCBA raises constitutional challenges to the § 6698 and § 6700 penalties, specifically contending that the § 6698 penalty is an attempt to impose recordkeeping requirements on the NCBA in violation of the Fifth Amendment and also contending that both penalties are the product of an IRS vendetta to squelch NCBA members' First Amendment right of free association and speech.
First, the NCBA contends that forcing it to file informational partnership returns would violate the Fifth Amendment privilege against self-incrimination. This blanket Fifth Amendment claim has been repeatedly rejected. See, United States v. Stillhammer, 706 F.2d 1072, 1076 (10th Cir. 1983); United States v. Lawson, 670 F.2d 923, 927 (10th Cir.1982). In addition, a partnership does not enjoy the same fifth amendment protection that an individual does, and can be compelled to produce records. Bellis v. United States, 417 U.S. 85, 100, 94 S.Ct. 2179, 2189, 40 L.Ed.2d 678 (1974). The NCBA's fifth amendment justification for failing to file returns must fail.
Second, the NCBA contends the penalties were a pretext to destroy individual members' First Amendment right of free association and speech. The first amendment prohibits Congress from passing laws "abridging the freedom of speech ... or the right of the people to peaceably assemble, and to petition the government for redress of grievances." U.S. Const. Amend. I. The NCBA claims the right to "freedom of association" and "free speech" affords it protection from the penalties. It further alleges a decade long IRS conspiracy against it has led to the deprivation of members' First Amendment rights.
The evidence at trial revealed no such conspiracy. The penalties the IRS imposed against the NCBA were lawful and warranted. That the IRS struggled in its characterization of the NCBA is understandable in light of the NCBA's protean form. Moreover, the not-coincidental correspondence between convicted tax offenders and NCBA members justified the IRS' interest in NCBA activities. See Gov't exhibit G-11 (listing NCBA members convicted of violating tax laws). The evidence revealed not an overzealous government agency bent on destruction of a legitimate political movement; but rather an agency given cause to investigate an organization encouraging violation of the revenue laws. In short, the NCBA failed to prove a government conspiracy to deprive its members of protected constitutional rights.
Finally, the NCBA contends the penalties impermissibly squelch freedom of speech. Courts have been loth to deem messages like that of the NCBA protected political speech. In White, 769 F.2d at 516, the court characterized the defendant's activities as commercial speech, and thus not protected because it promoted an illegal activity or transaction. There, defendant White directed and founded an organization that promoted and sold written materials and cassettes that presented "frivolous arguments against the constitutionality and legality of the federal income tax system." 583 F.Supp. at 1119. The organization sold the materials for $50, and also sold memberships for $250. Id. Likewise, in United States v. Buttorff, 761 F.2d 1056, 1066-68 (5th Cir.1985), the defendant's first amendment defense was rejected on the basis that the frivolous tax positions he advocated were pure commercial speech and subject to regulation for promoting an illegal activity. See In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 *666 (1982). Kaun, 633 F.Supp. at 418, also ruled the tax protest materials to be sanctionable commercial speech. Commercial speech that is false, misleading, fraudulent, or illegal enjoys no constitutional protection. Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748, 770-73, 96 S.Ct. 1817, 1829-31, 48 L.Ed.2d 346 (1976).
The NCBA contends that the more stringent standard of Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), applies to its activities and thus the § 6700 penalty could not be imposed absent a finding that its advocacy was "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." A footnote in the Seventh Circuit's opinion in Kaun, 827 F.2d at 1151 n. 3, expresses first amendment reservations about § 6700: "It is therefore possible that the broad scope of § 6700 may reach a person who merely advocates the nonpayment of taxes in general. This result would clearly run afoul of Brandenburg."
As was said before, though, the NCBA went beyond advocating nonpayment of taxes in general. It established a financial arm, the NCE, that actually put into practice the NCBA's anti-tax principles. Insofar as the § 6700 penalty was levied against the activities and promotion of the NCE, the NCBA was engaging in commercial speech subject to lessened first amendment protection. The case is no different from the rejected first amendment challenges to § 6700 in White, Kaun, and Buttorff. The NCBA's promotion of the NCE involved making statements the promoters knew to have been rejected by the federal courts. As such, this speech was sanctionable under § 6700. The First Amendment does not protect the NCBA from the consequences of its statements and actions.
Upon the foregoing, it is
ORDERED that judgment will enter dismissing all of the claims of the National Commodity and Barter Association/National Commodity Exchange with prejudice and awarding costs to the defendant.